**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Simeon BOZIC, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 17, 2009.

Filed June 24, 2010.

---

9. In the interest of judicial economy, the trial court may wish to address Williams's remaining claims on remand.

Daniel A. Rendine, Philadelphia, for appellant.

Mary Huber, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, GANTMAN, and ALLEN, JJ.

OPINION BY STEVENS, J.:

¶ 1 Appellant, Simeon Bozic, appeals from the judgment of sentence of life imprisonment without parole entered in the Court of Common Pleas of Philadelphia County, after a jury rejected his duress defense and convicted him of first-degree murder and related offenses for his role in beating and stabbing the twenty-one year old girlfriend of his co-defendant.[1] He claims the trial court abused its discretion in dismissing his weight of the evidence claim, in denying his requests for a mistrial or continuance when a purportedly key defense witness—co-defendant's wife—avoided a subpoena and failed to appear in court, in overruling his objection to the prosecutor's closing remarks, and in denying a presentence motion for extraordinary relief and post sentence motion for reconsideration, each asking for a new trial when the co-defendant's wife was located after trial.

¶ 2 Contemporaneously with the filing of this appeal, Appellant has petitioned this Court for remand to allow a full hearing on his post sentence motion for a new trial. Specifically, Appellant claims he was denied his right to a full and fair hearing when both the court and the Commonwealth failed to inform him at sentencing that co-defendant and his counsel improperly persuaded co-defendant's wife to avoid Appellant's subpoena. Finally, counsel for Appellant has filed a court-ordered peti-

---

1. The trial court granted a motion to sever the case as Appellant and co-defendant, Thomas "Napoleon" Strode, intended on presenting antagonistic defenses.

tion for remand responding to Appellant's *pro se* allegation that counsel has rendered ineffective assistance of counsel in the present appeal. After careful review of the entire record, party briefs, and the trial court opinion, we deny Appellant's petition for remand, counsel's petition for remand, and affirm judgment of sentence.

¶ 3 In its Pa.R.A.P. 1925(a) opinion, the trial court provides an apt summary of salient facts, as follows:

> The decedent in this case, Asia Adams, was a college student who came home to Philadelphia on the weekends. She had recently started going out with the co-defendant, Thomas [Napoleon] Strode, who was a close friend of [Appellant's]. On the night of November 7, 2004, [Appellant] and co-defendant decided to kill and rob Ms. Adams. The two of them went to her house, and they beat and stabbed her so savagely that they knocked teeth out of her mouth and nearly decapitated her. After she was dead, they took her money and her ATM card and used the card [the following day to make eight withdrawals totaling over $700, which the men used to go shopping together].
>
> The day after the murder, [Appellant] and co-defendant went back to the decedent's house. They tried to clean up the blood from the beating and moved her body from the basement to the second floor. They then set the house on fire, starting with the bedroom in which they had placed the decedent's body. After a neighbor called the fire department, the blaze was extinguished and the decedent's body was found.
>
> [Appellant] turned himself in to homicide detectives after they contacted his mother and let her know that they wanted to interview him. He gave a full[y] inculpatory statement and consented to having the statement videotaped. He admitted to killing the decedent and set-ting her house on fire, but he insisted that all of his actions were a result of his fear of the co-defendant. At the conclusion of the police interrogation, [Appellant] was arrested and charged with the murder of Asia Adams.

Trial Court Opinion dated 1/08/09 at 2–3.

¶ 4 Also adduced at trial was evidence of how co-defendant Strode related both to the women in his life and to his best friend, Appellant, with particular focus placed on whether he ever abused, subordinated, or controlled Appellant. According to Ms. Adams' best friend, Alexis Bethea–Lopes, she warned Adams not to become too deeply involved with Strode because he was an habitual liar who would say anything "to try to get you to take him seriously." N.T. 11/13/07 at 163–64. For example, she said, Strode would frequently make claims without any indication they were true, such as when he said he worked for the Drug Enforcement Agency when it appeared he was altogether unemployed, or when he explained his absence for a two week period one time by saying he was a fugitive from the law. N.T. at 163. She also testified that Strode was having a relationship with another woman besides Adams by the name of Sabra Smith, and that a week before the murder Smith was preparing to end her relationship with him after learning about Adams. N.T. at 185. Bethea–Lopes also recounted how on the day of the murder she had called Adams to persuade her to go out for the evening, only to have Strode take the cell phone from Adams and pointedly tell Bethea–Lopes that Adams was spending time with him that day. N.T. 11/13/07 at 165–66.

¶ 5 Never in her meetings with the two co-defendants, however, did she witness Strode abuse or in any way domineer Appellant. N.T. at 163. Bethea–Lopes also

testified that on the day after the murder, when she learned Adams' house was on fire and asked a friend to drive her to the scene, she saw Appellant and Strode walking down the street together each carrying shopping bags. N.T. at 172–73.

¶ 6 Kedar Johnson, a neighbor and friend to both Appellant and Strode, testified to receiving a late night phone call from Strode on November 7, 2004, offering to pay if Johnson would take him in for the night. N.T. 11/14/07 at 57–58. Johnson agreed, admitted Strode and Appellant into his mother's home about 15 minutes later, and accepted around $20 from Strode, who, Johnson claimed, owed him money anyway. N.T. at 59–61.

¶ 7 The next morning, Johnson awoke and saw Appellant had been first to rise. N.T. at 64. According to Johnson, Appellant was tapping his watch and told Strode it was time to leave, but Strode told him to be quiet and started back to sleep until Johnson rose to start his work day, which prompted co-defendants to leave. N.T. at 64, 81. When asked if he had ever witnessed Strode strong arm Appellant or tell him what to do, Johnson answered that he never witnessed that kind of relationship between the two, who, he believed, were good friends. N.T. at 67.

¶ 8 Detective Gary White of the Philadelphia Police Department's Homicide Unit testified about his investigation into the death of Asia Adams. Based on witness information indicating that Appellant may have been one of the last persons to see Ms. Adams alive, Detective White went to Appellant's mother's home, where Appellant was residing, to interview him. N.T. at 84–85. Appellant was not home at the time, so Detective White told Appellant's mother that it was important that police speak to Appellant, and he gave her

his card containing contact information. N.T. at 86.

¶ 9 Within a week, Appellant phoned Detective White and asked the detective to meet him at a street corner to talk about the case. N.T. at 87. When the detective arrived, Appellant appeared "a little shaken up" and said he wanted to explain what happened to Ms. Adams. N.T. at 88. Detective White stopped him in order to advise him of his *Miranda* rights and to transport him to the precinct. N.T. at 88. During the approximately seven minute drive, Appellant was volunteering information about Ms. Adams' murder, saying that he participated in it under duress, out of fear that co-defendant Strode would kill him if he did not assist in the murder. N.T. at 89, 116. Once at the precinct, Appellant was transported to the Homicide Unit at a different location, where Detective White and Detective Augustine were ordered to take Appellant's statement. N.T. at 90.

¶ 10 On the witness stand, Detective White read Appellant's statement for the jury.[2] According to the statement, Strode had gone to Appellant's home on Friday, November 5, 2004 and said that Ms. Adams wanted to see him, so Appellant accompanied Strode to her home. N.T. at 98. The three spent the day there watching movies and smoking marijuana until midnight, when Appellant left to go home to his mother's house. N.T. at 99. Appellant returned to Ms. Adams' house at 1:00 p.m. on Saturday and cooked breakfast for everyone. The three stayed in the home all day again until around midnight, when they went to a local bar until 2:00 a.m. closing. N.T. at 99. They returned to Adams' home where, like the night before, Appellant left Strode and Ms. Adams for the night. N.T. at 99. Appellant claimed

---

**2.** The jury subsequently watched a videotape with simultaneous audio cassette recording of Appellant's interview with the detectives. N.T. at 140, 143.

to walk to his mother's house and then around the neighborhood until daybreak, when he went to a friend's house situated just behind his mother's. N.T. at 99.

¶ 11 Early afternoon of Sunday, November 7, 2004, Appellant knocked on Adams' front door and she let him in. Like the previous two days, the three watched television and smoked marijuana for awhile. At some point later that afternoon, according to Appellant, he and Strode walked downstairs where Strode said "that he could kill Asia jokingly[,]" to which "[Appellant] said [']Whatever.[']" N.T. at 100.

¶ 12 Adams then came downstairs and said she had to leave to return to her college campus. She set the alarm and as they were leaving the alarm went off. Strode told her to cut off the alarm and, while she was doing so, he picked up a sculpture and hit her on the back of the head with it, causing her to fall to the floor. N.T. at 100. Adams started screaming "Napoleon, what are you doing? Are you going to kill me?" Strode told her to calm down and that nobody was going to die.

¶ 13 According to Appellant's statement, he asked Strode what was going on, but was told to "shut up" by Strode. N.T. at 101. Appellant then saw a large knife in Strode's right hand, and he watched as Strode sat atop a screaming Adams and began stabbing her in the upper chest and neck. N.T. at 101. Appellant claimed to be standing near the front door at this moment and in his statement says he was prepared to run when Strode turned to look back at him and said "come here." N.T. at 101. Appellant stood still, he claimed, while Strode said "I swear, I'll kill you, too. Don't go anywhere." N.T. at 101.

¶ 14 Strode grabbed Adams by her feet and dragged her down the basement stairs, causing her head to bounce off the steps as they went down. N.T. at 101.

During this time, Appellant remained at the front door. N.T. at 101. Strode then called to him "Get the fuck down here." N.T. at 101. In his statement, Appellant said "I was scared—I was scared to death that he was going to kill me and then I went down to the basement." N.T. at 101.

¶ 15 Once there, according to Appellant, Strode repeated his threat, saying "if you say anything, I swear that I'm going to kill you." N.T. at 101. Strode then set Ms. Adams in a chair in the middle of the basement, prompting Appellant to ask again "What are you doing, why are you doing this?" N.T. at 102. "I swear, Simeon, I don't want to have to kill you, too," Strode allegedly said, explaining that if he let her live now he and Appellant would surely go to jail. N.T. at 102. Appellant claimed to be shaking with fear at this point, "scared to death that he was going to kill me. I was saying to myself: [']Why is this happening?[']" N.T. at 102.

¶ 16 Appellant then stated that Strode picked up a shovel and hit Adams over the head with it. N.T. at 102. He handed the shovel to Appellant, and Appellant hit her over the head, too. N.T. at 102. "I hit her at least two times," Appellant said in his statement. N.T. at 102. Strode then took the shovel and hit Adams "at least eight more times until she was completely unconscious." N.T. at 102. According to Appellant, Strode then walked upstairs, returned with a knife, gave it to Appellant, and ordered him to cut Adams' throat. N.T. at 103. Appellant admitted he pulled back Adams' head and slashed her throat back and forth while Strode was holding his hand that had the knife in it. N.T. at 103.

¶ 17 In his statement, Appellant alleged that Strode said "all for the money, baby," when they pulled away from Adams' lifeless body. N.T. at 103. Strode took about $500 for himself and gave Appellant noth-

ing, Appellant said. N.T. at 105. Appellant then gave an account of how the two men cleaned themselves up, went to Kedar Johnson's house to sleep overnight, and returned to Adams' house the following morning. N.T. at 103–04. It was Strode, Appellant claimed, who on the way over to Adams house decided they were going to set the house on fire. N.T. at 104. After helping Strode carry Adams' body to the second floor bedroom, he left the house under Strode's order, he said, and waited for Strode around the corner. N.T. at 104. Strode appeared after setting the fire, according to Appellant, and took Appellant shopping where "[Strode] bought clothes for me and him." N.T. at 104.

¶ 18 Appellant called several witnesses to testify about Thomas Strode. Sabra Smith, Strode's former girlfriend, testified that one week before the murder, she was in possession of Strode's cell phone and answered it when Adams placed a call to it. N.T. 11/15/07 at 140. Before the women ended their conversation, they learned that Strode was romantically involved with both of them. N.T. at 141. Smith then confronted Strode with this information, and, according to her testimony, resolved to end her relationship with him because of Adams. N.T. at 143. She agreed to stay with him, however, when he told her that he wanted to be with her and not Adams. N.T. at 144.

¶ 19 On cross-examination, Smith testified that Appellant and Strode had been good friends who were always together. N.T. at 159. When she was in the company of the two men, she never saw Strode physically or verbally abuse Appellant, nor did she see him order Appellant to do things. N.T. at 159. In the week before police apprehended Strode in Smith's new Upper Darby address, Appellant had helped Strode move Smith there. N.T. at 158.

¶ 20 Candice Price, who had been Appellant's girlfriend of two months prior to the murder and stated at trial she was still in love with Appellant, testified that Appellant seemed sad and depressed when he came to see her on Wednesday, November 10, 2004. N.T. at 178. Appellant stayed with Price for five days, day and night, and only left her company once to go somewhere with Price's mother. N.T. at 178–79. He had never before stayed with her for such an extended time, N.T. at 200–01, and by Friday she asked him to explain the long visit. N.T. at 201. Appellant told her that his mother had kicked him out of the house and he had no place to stay. N.T. at 201. At no time during these five days was Appellant with Thomas Strode, and his only contact with Strode was when Strode called him on Thursday and Friday of that week. N.T. at 180–84. According to Price, Appellant was visibly upset after each phone call. N.T. at 180–84.

¶ 21 Appellant also subpoenaed Strode's wife, April Strode, to testify consistent with a statement she had given police that her husband had abused her both mentally and physically, including an episode where he had sliced her arm with a knife that he carried. N.T. 11/16/07 at 28. According to the notes of testimony of November 16, 2007, however, April Strode failed to appear in court.

¶ 22 In an effort to locate her, the court telephoned Michael Farrell, Esq., counsel for co-defendant Thomas Strode, to see if she had perhaps called her husband to let him know where she was. N.T. 11/16/07 at 33–34. Mr. Farrell confirmed that April Strode had, in fact, called his office and left a number where she could be reached, but it was April Strode's home number that the court had already tried to no avail. N.T. at 35–36. When Mr. Farrell had no other information about April Strode's whereabouts, the court excused him and

continued to the next defense witness. N.T. at 36.

¶ 23 Defense witness Shari Alesia Holloway was a friend of Asia Adams for twenty years. She had limited contact with Appellant and Thomas Strode, having seen them together in the neighborhood several times but having been in their company only once. N.T. at 39. Never in this limited history, however, did she see Strode order Appellant or act abusively toward him. N.T. at 51. She testified that Ms. Adams had been seeing Thomas Strode for the entire Summer of 2004, although Adams had confided in her that Strode's practice of seeing other girls was straining their relationship. N.T. at 41. Holloway also conveyed examples of other lies made by Strode, including when he told Adams he was unable to see her because he was "locked up" in jail, when, in fact, he was with another girl at the time. N.T. at 44. Adams had also told Holloway that in September, after Adams went back to school, she had paid Strode $100 for marijuana but only received $50 worth and wanted a refund of the other $50. N.T. at 46–49.

¶ 24 At the conclusion of Ms. Holloway's testimony, the defense moved for mistrial based upon the failure of April Strode to appear despite Appellant's subpoena. N.T. at 61. The absence of this key witness, defense counsel argued, deprived Appellant of his due process rights to a fair trial. In the alternative, defense counsel asked for a continuance until such time as authorities apprehended April Strode and brought her to court so that Appellant may be permitted to present his full defense. N.T. at 62.

¶ 25 The court was advised that April Strode had told her family and her employer she was leaving for California and had not given contact information to anyone. N.T. at 62. Without the resources to track her down, and acknowledging the court's "numerous attempts to assist [the defense] in getting her to appear here," the court declared April Strode indefinitely unavailable to all parties involved and denied Appellant's motions. N.T. at 62. To complete the record with respect to Appellant's motion for mistrial, the court permitted defense counsel to admit as part of the record, but not for the jury's consideration, April Strode's prior statement to police regarding Thomas Strode's abuse of her. N.T. at 63–64. With that, the defense rested. N.T. at 64.

¶ 26 During closing arguments, the prosecutor explained to the jury that because motive was not an element of the crimes charged, it did not have the burden of proving motive. The prosecutor nevertheless referred to how discrepancies between the physical evidence and Appellant's account of events allowed for the possibility that Appellant was equally motivated to murder Asia Adams:

**PROSECUTOR:** Here's a young girl who meets Napoleon [Thomas Strode]. He's got a nice I guess way of talking to the ladies, because they forgive him. He's a player. And women have a decision to make just as men. You play me, I'm leaving you, or I like you anyway and I'll take you under whatever circumstances.

Now, this monster met this young girl. It was funny when you think of things, it is almost like fate. Because you saw crime scene go in that house so many times and miss stuff. That's that little girl, that's that young lady. And she looks so happy as can be. She didn't know she was hugging a monster.

And he has game, because he has the dreads that the young girls like. [']Oh, he's so sensitive, he plays the guitar. I just love that guy. He's just misunderstood, that is what he is.[']

Now, she [Adams] goes and they [Adams, Appellant, and Strode] are hanging out. They are desperate for money, and they want it. But something—and the Judge will explain, I don't have to prove motive. Because we can't get into their head. We can sometimes infer it. Most people act for a reason, they do.

**But in that house on that weekend on that Sunday this young lady saw something that freaked them out. I don't know what Napoleon and him [sic] were doing. I don't know if she walked in on them or whatever they were doing, looking in the house for something, but she saw something that she was not going to leave there alive. She saw something that got them so upset that they tortured her, something in their minds was so horrible that they proceeded to humiliate her.**

They start beating her up. Think of what they did as they are beating her. Bad enough you are feeling pain, they took off her panties. They took off her panties. That's humiliating. It is embarrassing to say the least.

Why did they do that to her? Why did they want to expose something so private, so personal? What gave them such joy to do that? They did it.

Let's talk about his confession in light of the physical evidence.

He says he [Thomas Strode] bashes her on the head with a vase. So when I did the DNA thing, the stipulation, no blood on the vase. That vase broke, but there was a fight in that living room.

He [Appellant] says she was dragged down the steps. When I asked the doctor 'Were there any indication [sic] of dragging? She's being dragged and her back is to the ground, there would be scraping to her buttocks, legs, her thighs, her head. Nothing, no indication of any dragging.[3]

She was brought down there. She was brought down there because she was making too much noise. Because when you are beaten, you are not going to really cooperate. You are going to cry. You might cry out for help. Take her downstairs where it is more quiet.

N.T. at 126–129 (emphasis added).

¶ 27 After closing arguments and outside the presence of the jury, defense counsel objected that the prosecutor's suggestion that Adams paid with her life for catching Appellant and Strode doing something horrible together was prejudicial speculation and without any basis in the evidence presented at trial. N.T. 11/16/07 at 159–160. Even more prejudicial was the strong implication in the prosecutor's remarks that the two men were engaged in a homosexual encounter when Adams happened upon them, a theory for which, again, there was no evidentiary support, counsel argued. The court, however, denied counsel's objection, ruling that a homosexual encounter was neither expressed in the prosecutor's remarks nor implied to such a degree as to distract the jury from confining itself to the evidence admitted at trial:

> **DEFENSE COUNSEL:** Mr. Vega misstated the evidence when he stated that perhaps—and it was speculation not based on the evidence. Perhaps Miss Adams walked in on Mr. Bozic and Mr. Strode doing something, suggesting they were doing something horrible together, who knows what.

---

3. Dr. Gregory McDonald, a forensic pathologist and Assistant Medical Examiner for the City of Philadelphia who performed the autopsy on Asia Adams, testified that there was no indication anywhere on Adams' body that she had been dragged down a flight of stairs, "none whatsoever." N.T. 11/15/07 at 27.

There is nothing in Mr.—my client's statement that says that. It is in Mr. Strode's statement, which isn't in evidence, that they were having some type of argument and she walked down and she saw them, but it is not in this case.

THE COURT: The jury will recall what the evidence was. I'm not going to interrupt that one either [i.e., grant that objection either]. He didn't say that they were doing anything in particular.

DEFENSE COUNSEL: Judge, he also suggested that they were having some kind of sexual encounter.

THE COURT: I didn't hear him say that.

DEFENSE COUNSEL: Well, I would suggest that that is what he inferred.

THE COURT: I'm not going there. I don't believe that he inferred that. He didn't say it, I know that.

You are suggesting that that could be the reason to go into such a rage as to cut somebody's throat and burn them and whatever else?

DEFENSE COUNSEL: Judge, I'm not suggesting it. He suggested it.

THE COURT: He didn't go there. . . . I would have been on him, okay.

N.T. 11/16/07 at 159–161.

¶ 28 After receiving jury instructions on November 19, 2007, the jury returned on the following day with guilty verdicts on all charges, including first degree murder. N.T. 11/20/07 at 17. As the case proceeded to the penalty phase in this capital case, the judge imposed a gag order on the parties, ordering them to refrain from public discussion of the trial. N.T. 11/20/07 at 23. Prior to commencing the penalty hearing, however, Appellant entered into an agreement whereby the Commonwealth would not pursue the death penalty if Appellant testified in the capital murder trial of Thomas Strode. Appellant fulfilled his end of the agreement and the Commonwealth did not seek the death penalty.

¶ 29 At Appellant's sentencing hearing of March 13, 2008, defense counsel made a Pa.R.Crim.P. 704(B) oral motion for extraordinary relief for a new trial based upon the unavailability of April Strode during trial. Counsel was aware that April Strode's whereabouts were now known, as she had been located in Philadelphia after Appellant's trial and held in custody up to the time she testified at the capital murder trial of Thomas Strode. N.T. 3/13/08 at 4.[4]

¶ 30 Permitted to state his case on the oral motion, defense counsel reviewed how April Strode had been properly subpoenaed by the defense, spoke to defense counsel on the phone twice before trial, was told by both defense counsel and the prosecutor that her presence at trial was required, but nevertheless failed to appear for Appellant's trial. N.T. at 4–5. Now that she was available and had already testified at the trial of Thomas Strode, Appellant asked the court to grant him a new trial as her testimony on the dangerousness of Thomas Strode was essential to Appellant's defense of duress and a necessary condition to Appellant's receiving a fair trial.

¶ 31 The prosecution countered that the evidence against Appellant was overwhelming. The jury heard the statement he volunteered to police, had the opportunity to assess Appellant's demeanor in the video recording of the statement he gave police, and found Appellant lacking in credibility. Obviously significant to the

---

**4.** Thomas Strode was convicted of first degree murder and sentenced to death for the murder of Asia Adams.

jury, the prosecutor argued, was that the timeline of events as supplied by Appellant himself demonstrated that Appellant had several chances to escape safely and seek help in the neighborhood, but chose instead to stay with Thomas Strode. N.T. at 7–9.

¶ 32 The trial court agreed with the prosecution that there was "substantial other evidence of record" including the statement and videotape to convince the jury of Appellant's guilt beyond a reasonable doubt. N.T. at 10. April Strode's proposed testimony, moreover, would not have been exculpatory, the court reasoned, but would have simply gone to the weight of the evidence for the jury's consideration. N.T. at 10. As such, her statement when taken in the context of the other evidence admitted would not, in the court's opinion, have affected the outcome of the trial. N.T. at 11. The court, therefore, denied Appellant's presentence motion for extraordinary relief. N.T. at 11. Sentencing proceeded and the court imposed a mandatory term of life in prison without parole. N.T. at 25. Subsequently, the court denied Appellant's post-sentence motion for reconsideration on the same basis.

¶ 33 Not known to defense counsel until after filing the present direct appeal was that two weeks prior to sentencing, on February 27, 2008, the trial court had conducted an *in camera* interview of April Strode after she had been apprehended in Philadelphia earlier that day and brought directly to court on a bench warrant. Also present in chambers at the outset were the prosecuting attorney and Michael Farrell, Esq., defense counsel for Thomas Strode, although the court excused Farrell because it concluded his attendance was not needed at a hearing to determine why April Strode avoided the subpoena served her by Appellant. N.T. 2/27/08 at 6–9.

¶ 34 Under direct examination by the prosecutor, April Strode testified that Thomas Strode and his defense counsel Michael Farrell told her over the phone she did not have to go to court to testify at Appellant's trial. N.T. at 12. According to her testimony, Thomas Strode had called her at work and, in response to her consternation at the prospect of being involved in Appellant's trial, said to her "You don't have to go, and my lawyer says you don't have to go. You don't have to go." N.T. at 14. During the hearing, April Strode informed the court that she was afraid of Thomas Strode when he spoke to her on the phone.

¶ 35 Defense Counsel Michael Farrell had also called April Strode in the first week of November, 2007, she testified, and said "Oh, you're not going to be a part of this. You are not—**you are not going to be subpoenaed.** You don't have to go to court." N.T. at 16 (emphasis added). She went on to say about Farrell: "[h]e said I **don't have to go to Court if I don't receive a subpoena, and I won't be receiving a subpoena, so I don't have to go to Court.**" N.T. at 23. (emphasis added). When Thomas Strode spoke to her in a separate phone call, however, he allegedly went beyond Farrell's statement to advise April Strode not to sign the subpoena if she received it: "[Thomas Strode] said 'if you don't sign it, you don't have a subpoena, you are not subpoenaed, and plead the fifth. Don't come to court, you know.' " N.T. at 23.

¶ 36 When the prosecutor asked her if she thus hid so that she would not receive a subpoena, April Strode answered "Yes, sir. I was doing what I figured was supposed to be done." N.T. at 24. Shortly thereafter, however, she contradicted herself by testifying that she never called Farrell for subsequent advice because she did not trust him. N.T. at 25.

¶ 37 April Strode was then asked to relate to the court the pretrial conversa-

tions she had with both Appellant's counsel and the prosecuting attorney. She claimed to tell defense counsel that Mr. Farrell had told her that she would not be involved in Appellant's trial and that she would not have to go to court. N.T. at 22. She also recalled that the prosecutor had phoned her on at least two occasions and told her that her attendance at trial was required, that she had no choice in the matter, and that it was important that she show. N.T. at 16.

¶ 38 April Strode also confirmed that she was not in contact with co-defendant's counsel Michael Farrell during the time authorities were attempting to locate her. N.T. at 17. She admitted talking to Thomas Strode one more time after Appellant's trial had ended, and she asked him if she would get in trouble for not going to court. He allegedly said she would not get in trouble, and that was the last time she had spoken to him. N.T. at 19.

¶ 39 At the conclusion of the hearing, the court ordered that April Strode be held as a material witness and housed in the local prison for the upcoming Thomas Strode trial. N.T. at 27. She would later testify at her husband's trial where, as noted *supra,* he was convicted and sentenced to death.

 ¶ 40 Herein, Appellant raises the following issues for our review:

**I. WHETHER THE GUILTY VERDICTS WERE AGAINST THE WEIGHT OF THE EVIDENCE?**

**II. WHETHER THE DEFENDANT WAS DEPRIVED OF HIS DUE PROCESS RIGHTS UNDER THE PENNSYLVANIA AND UNITED STATES CONSTITUTION[S] BECAUSE SUBPOENAED WITNESS APRIL STRODE PURPOSEFULLY FAILED TO APPEAR UPON IMPROPER ADVICE OF CO-DEFENDANT NAPOLEON STRODE AND CO-DEFENDANT'S COUNSEL?**

**I. WHETHER THE PROSECUTOR'S CLOSING ARGUMENT WAS UNDULY PREJUDICIAL?**

Brief for Appellant at 3.

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Dupre,* 866 A.2d 1089, 1101 (Pa.Super.2005), *appeal denied,* 583 Pa. 694, 879 A.2d 781 (2005) (citing *Commonwealth v. Sullivan,* 820 A.2d 795, 805–806 (Pa.Super.2003), *appeal denied,* 574 Pa. 773, 833 A.2d 143 (2003) (quoting *Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 751–752 (2000))). The Pennsylvania Supreme Court has explained that "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Widmer,* 744 A.2d at 753 (citation omitted). To grant a new trial on the basis that the verdict is against the weight of the evidence, this Court has explained that "the evidence must be 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" *Sullivan,* 820 A.2d at 806 (quoting *Commonwealth v. La,* 433 Pa.Super. 432, 640 A.2d 1336, 1351 (1994), *appeal denied,* 540 Pa. 597, 655 A.2d 986 (1994)).

[This Court shall not undertake to reassess credibility of witnesses, as] it is well settled that we cannot substitute our judgment for that of the trier of fact. *Commonwealth v. Holley,* 945 A.2d 241, 246 (Pa.Super.2008). Further, the finder of fact was free to believe the Commonwealth's witnesses and to disbelieve the witness for the Appellant. *See Commonwealth v. Griscavage,* 512 Pa. 540, 517 A.2d 1256· (1986) (the finder of fact

is free to believe all, none, or part of the testimony presented at trial).

*Commonwealth v. Manley*, 985 A.2d 256, 262 (Pa.Super.2009).

A person is guilty of first degree murder where the Commonwealth proves: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *See* 18 Pa. C.S. 2502(a)[.] An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. 2502(d). "The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 651 (2008) (citations omitted).

*Commonwealth v. Brown*, 987 A.2d 699, 705 (2009) (citation omitted).

¶ 41 Upon review, we conclude that the trial court did not abuse its discretion in denying Appellant a new trial on his weight of the evidence claim. Witness testimony placed Appellant and co-defendant with Adams on the weekend she was murdered, and physical evidence placed Appellant in the basement where the murder took place. Moreover, Appellant admitted participating in the murder, but insisted he only did so under duress.[5] His statement made to police, however, betrayed his duress defense, as by his own version of events he had ample opportunity while standing at the front doorway to flee the scene as an unarmed Strode dragged Adams downstairs to the basement. Instead of seeking immediate help in the neighborhood, he chose to stay with Strode.

¶ 42 Moreover, eyewitness testimony further belied Appellant's claim of duress. The jury heard testimony from several witnesses that Appellant and co-defendant Strode were best friends without any indication that Strode abused or controlled Appellant in any way. Furthermore, Kedar Johnson's testimony established that the co-defendants, fresh from having just murdered Adams, slept in his house all night without any apparent discord between them. In fact, Appellant awoke first and, rather than seeking to get away from Strode, was telling Strode it was time

---

5. Duress is a defense to criminal culpability. *See Commonwealth v. Markman*, 591 Pa. 249, 283–284, 916 A.2d 586, 606–07 (2007). It is codified in the Crimes Code as follows:

(a) **General Rule.**—It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

(b) **Exception.**—The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

18 Pa.C.S. § 309. Although at common law duress was not available as to a charge of first-degree murder, the absence in Section 309 of an exception for any particular offense makes the defense of duress available in this Commonwealth as to a charge of first-degree murder, it has been held. *See Markman, supra.*

"The elements which must be shown to establish a duress defense are: (1) an immediate or imminent threat of death or serious bodily injury; (2) a well grounded or reasonable fear that the threat will be carried out; and (3) no reasonable opportunity to escape the threatened harm except by committing the criminal act." *Commonwealth v. Baskerville*, 452 Pa.Super. 82, 681 A.2d 195, 200 (1996).

to wake up and leave Johnson's home together. Bethea–Lopes also described how, as she raced to the fire at Adams' home that same morning, she saw the two men she knew walking together, side-by-side, holding shopping bags full of clothes that the police would later learn were purchased with Adams' money.

¶ 43 Under this record, we conclude that the jury's verdict that Appellant was guilty of first degree murder was not so contrary to the evidence as to shock the conscience of this Court. *See Baskerville, supra* (holding defendant did not act under duress during murder and robbery, though he owed money to coconspirator's friend, knew coconspirator had gun, and was afraid of what coconspirator might do with it, where defendant did not turn himself in and failed to take several opportunities to flee crime scene). Thus, Appellant's weight of the evidence claim against the trial court's exercise of discretion fails.

¶ 44 Appellant next asserts various instances of error with the trial court's handing of missing defense witness April Strode, the wife of co-defendant Thomas Strode. In a previous statement given to police and made part of the record outside the jury's presence at Appellant's trial, April Strode alleged that her husband Thomas Strode was mentally and physically abusive toward her, so much so that he once lacerated her arm with a knife that he carried.

¶ 45 According to Appellant, April Strode's testimony was so patently critical as corroborative evidence to his duress defense as to have required the court to grant defense motions for mistrial or, in the alternative, a continuance when April Strode failed to appear in court and could not be located. Subsequently, Appellant advanced the same argument unsuccessfully in a presentence motion for extraordinary relief and again in post-sentence motions, asking the court to grant him a new

trial so that April Strode, who had been apprehended after trial, may testify.

¶ 46 As Pa.R.Crim.P. 106(A) provides in pertinent part, "The court ... may, in the interests of justice, grant a continuance, on its own motion, or on the motion of either party." Appellate review of the trial court's decisions on continuance motions rests on an abuse of discretion standard. *Commonwealth v. Peay,* 806 A.2d 22, 30 (Pa.Super.2002). "The refusal to grant a continuance constitutes reversible error only if prejudice or a palpable and manifest abuse of discretion is demonstrated." *Commonwealth v. Roser,* 914 A.2d 447, 456 (Pa.Super.2006) (citation omitted). When reviewing a trial court's decision to deny a request for a continuance, we must consider the following factors:

(1) the necessity of the witness to strengthen the defendant's case;

(2) the essentiality of the witness to the defendant's defense;

(3) the diligence exercised to procure his or her presence at trial;

(4) the facts to which he or she could testify; and

(5) the likelihood that he or she could be produced at court if a continuance were granted.

*In re A.J.,* 829 A.2d 312, 314 (Pa.Super.2003)

¶ 47 The following standards apply to our review of a trial court's denial of a motion for a mistrial:

The trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, ... assess the degree of any resulting prejudice. Our

review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Commonwealth v. Judy,* 978 A.2d 1015, 1019 (Pa.Super.2009) (quoting *Commonwealth v. Lettau,* 955 A.2d 360, 363 (Pa.Super.2008) (internal citations and quotations omitted)). "The remedy of a mistrial is an extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal." *Judy,* 978 A.2d at 1019 (citations omitted).

¶ 48 Applying the above standards to the case *sub judice,* we conclude that not only did Appellant fail to establish that April Strode could have been located within a reasonable time or that the court failed to exercise due diligence in attempting to locate her, Appellant also, and most critically, failed to establish how the absence of April Strode's testimony during trial caused him prejudice or denied him a fair and impartial tribunal. April Strode's statement indicated that co-defendant Thomas Strode was a controlling spouse who had seriously abused her in the past, once to the point of lacerating her arm with a knife. The record as it stood had, however, already cast Thomas Strode as a dishonest, manipulative, and controlling man who mistreated the women with whom he was romantically involved. Indeed, Appellant admits as much in his brief, where he acknowledges "the overwhelming evidence concerning the co-defendant Mr. Strode was that he was a[n] abuser of wom[e]n, inveterate liar, and a manipulat[ive] and cunning individual." Brief for Appellant at 25. The jury thus heard multiple sources portray Thomas Strode in this bad light with respect to the women in his life.

¶ 49 Yet, significantly, these same witnesses testified they never saw Thomas Strode treat his best friend Appellant in a similarly abusive manner. Not even Appellant himself claimed in his statement that he had ever been afraid of Strode or subject to his control in the course of their friendship. This is illustrated in one part of Appellant's statement, where he went from being relatively dismissive of Strode's initial comment that he could kill Adams, saying "whatever," as if he were accustomed to hearing Strode make such threatening statements about his girlfriends, to expressing utter shock and surprise when Strode allegedly turned his ire toward him and threatened to kill him if he did not help with Adams. In light of this record, the allegation that Thomas Strode once physically abused his wife, once to the point of cutting her arm with a knife, therefore had limited relevancy to Strode's longstanding relationship with Appellant.

¶ 50 So, too, has Appellant failed to establish that April Strode's testimony would have affected the jury's assessment of his duress defense. Even if we were to assume that April Strode's statement would have caused the jury to believe it was Thomas Strode who initiated the violence against Asia Adams, the jury would still have heard that Appellant chose not to avail himself of several clear opportunities to flee the crime scene and seek help in the neighborhood. According to Appellant's own account, he stood at the threshold of the front door as Thomas Strode pounced on Adams and began stabbing her, all with his back was turned to Appellant. Moreover, Appellant remained at the doorway as Strode dropped the knife and dragged the injured Adams downstairs into the basement. Instead of running at either time, Appellant elected to

stay and assist in the killing of Asia Adams.

¶ 51 Nor did Appellant attempt to free himself from Thomas Strode's alleged control afterward. He walked to Kedar Johnson's house with Strode and spent the night there, and went so far as to wake Strode up the following morning. He went shopping with Strode during the day, and never sought police until he learned that police had gone to his home looking to talk to him about the murder.

¶ 52 We therefore discern no way in which April Strode's testimony could have corroborated Appellant's duress defense and thus altered the jury's verdict in light of his own admitted failure to flee when he had at least two separate and clear chances to do so during the murder, and several opportunities to report the crime in the immediate aftermath. Without any indication that the absence of April Strode's testimony thus caused Appellant prejudice at trial, we reject his challenges to the rulings which denied his motions for mistrial or, in the alternative, a continuance.

¶ 53 It necessarily follows, therefore, that the denial of a meritless motion for continuance or mistrial could not have constituted a trial error warranting the extreme remedy of granting Appellant's motion for extraordinary relief. Pa. R.Crim.P. 704(B) provides:

**B) Oral Motion for Extraordinary Relief.**

(1) Under extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial.

(2) The judge shall decide a motion for extraordinary relief before imposing sentence, and shall not delay the sentencing proceeding in order to decide it.

(3) A motion for extraordinary relief shall have no effect on the preservation or waiver of issues for post-sentence consideration or appeal.

Pa.R.Crim.P. Rule 704(B). Furthermore, the Comment to Rule 704(B) explains a motion for extraordinary relief should be granted where it is manifest, for example, that an egregious error has been committed during trial or a change in controlling case law has occurred such that immediate relief prior to sentencing is essential.

¶ 54 As explained above, the trial court committed no such error warranting Rule 704(B) relief. Nor are we persuaded by Appellant's bare allegation that the post-trial emergence of April Strode was tantamount to a post-trial change in controlling precedent, as we have already rejected the notion that April Strode's testimony would have had much influence on the jury, let alone controlled the outcome of the trial.

¶ 55 Appellant's final argument with respect to April Strode is that the court abused its discretion in denying his post-sentence motion for a new trial, which at the time was essentially a reiteration of his pre-sentence motion for extraordinary relief. His argument to this Court differs from that raised with the trial court, however, because it was only after he filed his direct appeal that Appellant learned the trial court and the Commonwealth had conducted an *in camera* interview of April Strode to determine if she had been intimidated from appearing at trial. Appellant now claims the failure of the court and prosecutor to disclose the contents of April Strode's testimony from the *in camera* interview precluded him from arguing at pre-sentence or post-sentence that Thomas Strode and his defense counsel, Michael Farrell, by advising April Strode not to testify, deprived him of his due process right to a fair trial.[6] In light of this non-

---

6. Appellant does not contend that the *in cam-* era interview was, itself, improper.

disclosure, Appellant asks for a new trial or, in the alternative, a full hearing on the issue of witness tampering and how it may have affected the outcome of his trial.

¶ 56 In support of his position, Appellant cites to numerous appellate decisions granting new trials where either the Commonwealth or the court withheld evidence that, if known by the defense, would have created the reasonable likelihood of a different verdict. See Brief for Appellant at 42–44 (citing, e.g., Commonwealth v. Strong, 563 Pa. 455, 761 A.2d 1167 (2000) (holding failure to disclose agreement between prosecution and key witness whose testimony placed gun in defendant's hand at time of murder necessitated new trial); Commonwealth v. Anderson, 538 Pa. 559, 649 A.2d 662 (1994) (holding failure to disclose pending competency hearing involving complaining witness required new trial where defense could cross-examine on competency); Commonwealth v. Green, 536 Pa. 599, 640 A.2d 1242 (1994) (holding failure to disclose co-defendant's statement of responsibility for homicide required new trial even though statement was inadmissible at trial, as it may reasonably have led to further exculpatory evidence); Commonwealth v. Santiago, 405 Pa.Super. 56, 591 A.2d 1095 (1991) (plurality holding that trial court's failure to disclose materially exculpatory evidence obtained during in camera interview with potential witness required new trial)).

¶ 57 The facts of these cases are fundamentally inapposite, however, as they all involved the failure to disclose either impeachment evidence of witnesses or other material evidence that would very well have exculpated the defendant during trial. Here, in contrast, the role of Thomas Strode and his defense lawyer in keeping April Strode away from trial was not capable of disclosure during trial, as neither the court nor the prosecution discovered their role in April Strode's absence until after trial had ended.

¶ 58 Even more important, in any event, is that evidence of Thomas Strode persuading April Strode against testifying [7] is not sufficiently materially exculpatory when viewed against the totality of evidence presented so as to warrant a new trial. Indeed, apart from calling the conduct of Thomas Strode and Michael Farrell "extremely questionable," "abominable," and "reprehensible," see Brief for Appellant at 44, Appellant fails to offer so much as a meaningful theory as to how their conversations with April Strode, if known by a jury, could have exculpated him. The most he says in this respect is that "Mr. Strode did not want her to testify because for some twisted reason apparently believing [sic] that her testimony favoring Mr. Bozic, even in a separate trial, would somehow hurt him." See Brief for Appellant at 44. While it is true that Thomas Strode's self-serving efforts to keep April Strode from testifying evinced a consciousness of guilt on his part, they did not correspondingly suggest that Appellant acted under duress.

¶ 59 Therefore, there is simply no indication that the outcome of Appellant's trial would be different if a jury learned that Thomas Strode persuaded April Strode not to testify. The court therefore committed

---

7. The record as developed in the February 27, 2008 in camera interview of April Strode does not bear out Appellant's contention that Michael Farrell told April Strode not to appear at court. Instead, under intense questioning by both the prosecuting attorney and the court, April Strode quoted Farrell as saying she would not have to go to Appellant's trial because she would not be subpoenaed to testify. As quoted, Farrell's statement was nothing more than a prediction, and while later proven to be inaccurate, reckless, and ill-advised, it nevertheless was quite different from advising April Strode to avoid a subpoena.

no error in denying post-sentence motions. For the same reasons, we also deny appellate counsel's petition to remand this matter to the trial court for a hearing on the issue raised in Appellant's post-sentence motion.

¶ 60 In his final issue, Appellant argues that the prosecutor's speculative and inflammatory closing remarks denied him a fair and impartial jury. With regard to a claim of prosecutorial misconduct in a closing statement, it is well settled that:

[t]he prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence. In considering a claim of prosecutorial misconduct, our inquiry is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one. Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect ... [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Smith,* 985 A.2d 886, 907 (Pa.2009) (quoting *Commonwealth v. Washington,* 549 Pa. 12, 27, 700 A.2d 400, 407–408 (1997)) (quotation marks omitted).

*Commonwealth v. Ragland,* 991 A.2d 336, 340–341 (Pa.Super.2010).

¶ 61 As noted *supra,* the prosecutor had just called into question that portion of Appellant's statement where Appellant alleged it was Thomas Strode who unilaterally attacked Adams with a vase, assaulted her with a knife, and dragged her down the stairs as Appellant simply stood surprised and watched. Without blood on the vase or any physical evidence consistent with Adams' legs scraping or head bouncing down the stairs to corroborate Appellant's account, the prosecutor suggested several vague, one sentence scenarios— including that Adams "walked in on" Appellant and Strode—that may have been enough in the minds of Strode and Appellant to stir them to murder.

¶ 62 After closing arguments were complete and the jury had been excused from the courtroom, defense counsel objected to the prosecutor's alternate scenarios. As can be seen from the extensive excerpt reproduced *supra,* the court entertained extensive argument on the issue and determined that the prosecutor's commentary was sufficiently brief and vague so as not to have formed in the minds of the jury a bias that would detract it from deciding the case solely on the evidence before it.

¶ 63 The court's determination in this regard finds full support under the above standard of review. Specifically, we agree that the prosecutor's suggestion of scenarios different from Appellant's account was not only a reasonable inference made from the physical evidence of the case, but also not so protracted or explicit as to inflame the jury to substitute passion for objectivity. Moreover, the phrase "walked in on Appellant and Strode" does not necessarily imply a homosexual encounter, and a review of the entire trial transcript shows the Commonwealth's evidence and closing argument actually portrayed Thomas Strode as a "ladies' man" who controlled the women with whom he was romantic. Similarly, the jury learned that Appellant had a girlfriend at the time, witnessed her testimony that she still loved him at the time of trial, and heard nothing in her testimony suggesting that Appellant may have had homosexual tendencies.

¶ 64 The excerpt of the prosecutor's closing also shows the prosecutor did not dwell on this theory, but immediately continued to the next suggestion that Adams may have caught Appellant and Strode looking for something they should not have

been. In short, the court ruled properly that the prosecutor's closing remarks were fair comment, not unduly prejudicial, and thus did not warrant remedial action.

 ¶ 65 Finally, we address appellate counsel's Petition for Remand for Appointment of New Counsel, which this Court ordered him to file in response to Appellant's *pro se* motion to appoint new counsel. Initially, we note that counsel has complied with the mandatory procedures for addressing *pro se* allegations of ineffective assistance of appellate counsel, as he has (1) listed each claim Appellant wishes to have reviewed and detailed the nature and extent of his review of the merits of those claims; and (2) set forth an explanation of why the petitioner's issues are meritless. *See Commonwealth v. Lawrence,* 408 Pa.Super. 9, 596 A.2d 165, 168 (1991). *See also Commonwealth v. Battle,* 883 A.2d 641, 645 (Pa.Super.2005) (outlining procedures for addressing *pro se* allegations of ineffective assistance of appellate counsel).

 ¶ 66 It is apparent from reviewing counsel's petition that much of the *pro se* petition alleges ineffectiveness not with counsel's appellate performance but with his pre-trial and trial performance. Claims of ineffective assistance of trial counsel, however, are properly deferred until collateral appeal, where a defendant may raise them in a petition filed pursuant to the Post Conviction Relief Act, 42 Pa. C.S.A. §§ 9541–9546. *See Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 737 (2002) (holding review of ineffective claims generally should not be conducted on direct appeal but should be deferred until collateral review).

 ¶ 67 The only part of Appellant's *pro se* motion, as addressed by counsel's petition, that we may properly review on direct appeal is his contention that counsel failed to involve Appellant adequately in preparation of his appeal by "refusing to respond to numerous letters and not allowing petitioner to review and obtain copies of the pre-trial transcripts and other requested information." Without such materials, Appellant claims, he "cannot properly investigate and research valid issues on appeal." Counsel responds to the contrary, asserting that he did, in fact, provide Appellant with copies of all discovery and all pre-trial and trial transcripts as soon as they were available. He also answered all correspondence from Appellant, counsel states, and supports this contention with attached exhibits proving Appellant's accusations to be false.

¶ 68 Therefore, without arguable merit to the underlying claim that counsel failed to keep Appellant involved in his appeal, Appellant's allegation of ineffective assistance of present appellate counsel is patently frivolous, such that we deny counsel's court-ordered petition to remand for appointment of new appellate counsel. *See Battle, supra* (noting that for an ineffective assistance of counsel claim to prevail, the defendant must establish, *inter alia,* that the underlying claim is of arguable merit).

¶ 69 Judgment of sentence is affirmed. Petition to remand to litigate post-sentence motion is denied. Petition to remand for appointment of new appellate counsel is denied.