J-A14012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY YOUNG | : | |
| | : | |
| Appellant | : | No. 1032 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 21, 2014
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002841-2012

BEFORE: LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED AUGUST 16, 2024**

Anthony Young appeals, *nunc pro tunc*, from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following a non-jury trial, after which he was convicted of several sexual offenses and related crimes. On appeal, Young contends that the trial court lacked subject matter jurisdiction because the victim's testimony that the crimes occurred in Philadelphia County was disputed, inconsistent, and wholly unreliable. After careful review, we affirm.

In January 2012, Young was arrested and charged with the following crimes: rape[1], rape of a child[2], rape by threat[3], sexual assault[4], indecent assault[5], indecent exposure[6], terroristic threats[7], and simple assault[8]. The charges stem from Young's alleged abuse of the victim, his cousin, M.A.,[9] from 1999 to 2007, when M.A. was between the ages of four and twelve. M.A. alleged that the abusive conduct occurred in New Jersey, Ohio, and Philadelphia, Pennsylvania.

In 1999, when M.A. was four years old, she lived with her great-grandmother in Camden, New Jersey. *See* N.T. Non-Jury Trial, 12/16/13, at 131-32. M.A. wrote in a letter to the police stating, "when I was four, I was molested by [Young] until I was six. Then when I turned seven, he started to

_____

[1] 18 Pa.C.S.A. § 3122.1(a)(1).

[2] *Id.* at § 3122.1(a)(6).

[3] *Id.* at § 3122.1(a)(2).

[4] *Id.* at § 3124.1.

[5] *Id.* at § 3126(a)(7).

[6] *Id.* at § 3127(a).

[7] *Id.* at § 2706(a)(1).

[8] *Id.* at § 2701(a).

[9] M.A. refers to Young as her cousin, but their exact relationship is not clear from the record. While M.A.'s grandmother referred to Young as her nephew, *see* N.T. Non-Jury Trial, 12/16/13, at 84, M.A. testified that she and Young share the same great-grandmother. *Id.* at 131.

rape me and touch me and doing [sic] wrong." *Id.* at 158, 169. M.A. testified that when she was approximately six or seven years old, then-twelve-year-old Young would touch M.A.'s vagina and chest through her clothes. *Id.* at 134-38. At that time, Young began forcing M.A. to have oral sex in her Camden bedroom and touching the outside and inside of M.A.'s vagina with his hands and penis. *Id.* at 134-38, 169.

Around 2002, when M.A. was approximately seven or eight years old, she would visit her maternal grandaunt's home located at 58th Street and Osage Avenue in Philadelphia. *Id.* at 25, 138. On more than one occasion at the maternal grandaunt's home, Young made M.A. "perform oral [sex on] him and [Young] pretty much like used his [penis] and performed things on me and touched me the same." *Id.* at 139. At the time of the assaults in Philadelphia, M.A. would tell Young "no," and when she threatened to tell others about the assaults, Young "would pretty much threaten [her] and still made [her] do it." *Id.* at 140. M.A. testified that Young would say that "he would hurt me, my family, [and] my mom [if she reported the assaults]." *Id.* M.A. further reported that, while in Philadelphia, Young would randomly burn her leg and ankle while she was sleeping. *Id.*, 12/17/13, at 47. M.A. testified that Young sexually assaulted her in Philadelphia on at least three or four occasions. *See id.*, 12/16/13, at 141.

In 2004, when M.A. was eight or nine years old, she visited relatives in Ohio and would stay at Young's house where he lived with his mother and stepfather. *Id.* at 27, 142. During one visit, Young made M.A. perform oral

sex on him and forced his penis into her vagina. *Id.* at 145. M.A. testified that such abuse happened "more than once." *Id.* When M.A. wanted to tell others about the abuse, Young pushed M.A.'s leg into a wall, making a hole in the wall with her knee. *Id.* at 144. While M.A. was in Ohio, Young also burned the inside of M.A.'s thigh with a curling iron when she threatened to tell others about the abuse. *Id.*

Around 2006-2007, M.A. visited her maternal aunt in Philadelphia on her way back from Ohio to New Jersey. *Id.* at 147-48, 229-30. Young was also present at M.A.'s maternal aunt's house and "wanted M.A. to perform actions on him." *Id.* at 148. M.A. rebuffed Young's advances and retreated to an area where her family was gathered so she would not be alone with Young. *Id.* From approximately 2001 to 2006, when M.A. was between the ages of six and eleven, she spent time with that same maternal aunt, who is a licensed practical nurse in pediatrics.[10] *Id.* at 13-14, 18-19. M.A.'s maternal aunt testified that "[when M.A.] came to visit, she complained of itching and burning [near her genital area]." *Id.* at 19. While bathing M.A., the aunt noticed "irritation, redness, [and] puffiness [near M.A.'s genital area]," but assumed that it was due to the type of soap or laundry detergent that M.A.'s grandmother used. *Id.* M.A.'s maternal aunt testified that one incident of vaginal swelling and irritation corresponded to a time when Young visited his

---

[10] M.A.'s maternal aunt testified that M.A. would often stay with her for long weekends, holidays, and any school breaks. However, the record is not clear as to where the aunt lived during that time.

- 4 -

great-grandmother in the Camden house where M.A. was living.  *Id.* at 20-22.  M.A. visited a doctor several times for vaginal issues.  *Id.* at 169-70.

M.A. first disclosed the sexual assaults to her grandmother in 2008.  During an unrelated argument with her grandmother, M.A. said "some things you just don't understand" and "I'm not going to tell you because you're not going to believe me anyway."  *Id.* at 89.  In response, M.A.'s grandmother suggested that M.A. write a letter to her describing her concerns.  *Id.*  M.A. summarized Young's abuse, and, after reading the letter, M.A.'s grandmother asked M.A.'s maternal aunt, the pediatric nurse, to come to the house to discuss the situation.  *Id.* at 90.  M.A. testified that she felt comfortable disclosing what happened because she believed that she would not see Young again.  *Id.* at 153.

That same year, M.A.'s maternal aunt took M.A to the police in Coatesville, where the aunt lived at the time.  *Id.* at 58.  The Coatesville police advised M.A. and her aunt to reach out to the police in New Jersey, Philadelphia, or Ohio, where the assaults occurred.  *Id.* at 59, 195.  M.A.'s aunt also took M.A. to a behavioral therapist for mental health treatment because of the assaults.  *Id.* at 38.  After several years of therapy, in 2011, M.A. told her high school counselor about the assaults, and, ultimately, spoke to detectives in the Philadelphia Police Special Victims Unit (SVU) about the sexual abuse.  *Id. at* 156, 159.

On April 1, 2011, May 17, 2011, and August 25, 2011, M.A. gave statements to detectives in the Philadelphia Police SVU about the abuse Young

inflicted upon her in Philadelphia. In the first interview, M.A. told detectives that, on Osage Avenue, Young would "make me perform oral sex on him, he would do that to me. He would put his penis in my vagina, he tried to put it in my butt once." *Id.* at 192. In the second interview, M.A. stated that at her grandaunt's Philadelphia home, Young would "touch me on my chest area and my vagina area on top of my clothing," and that when Young would take M.A. upstairs, he would "rape [her]." *Id.* at 179. In M.A.'s third interview, she first stated that "[Young] tried [to sexually assault her] in Philadelphia and the last time he tried was in Coatesville in [her a]unt's [] house." *Id.* at 183. When the detective asked M.A. a follow-up question about her statement that Young *tried* to sexually assault her, M.A. stated that Young "raped me in my [a]unt's house, he touched me and tried to get me to do things to him, actually he did get me to do things to him." *Id.* at 207. When asked why she did not report the assaults earlier, M.A. said that Young "would tell me not to [tell anyone about the assaults] because [Young] said that he would hurt my family or me and I was scared." *See* Commonwealth Exhibit C-9, at 1-3.

However, at the preliminary hearing in Philadelphia, M.A. recanted and testified that "nothing [] sexual had happened" between her and Young in Philadelphia, and that she was "performing" (lying) about Young touching her. *See* N.T. Non-Jury Trial 12/16/13, at 161-63. At trial, M.A. testified that her contradictory statement at the preliminary hearing was a lie because she "was ready to get out of there and didn't want to be around" her family or Young's family. *Id.* at 162-63; *see also id.* (outside preliminary hearing courtroom,

- 6 -

M.A.'s great-grandmother called M.A. "a B[itch] and said that [M.A.] was lying and said [sic] this was not necessary"). Testifying about the preliminary hearing, M.A. said, "at that point I was going through a lot, and it was putting a lot of stress on me, and I just couldn't handle it at that point in time." *Id.* at 166. When questioned at trial about the contradiction in M.A.'s third statement to the SVU detectives, she explained that it was due to pressure from family members to "let it be a family matter." *Id.* at 190 (M.A. testifying, "my mom and his mom were talking and my mom was sitting up there and telling me I shouldn't do anything and she was telling me just to say that nothing was happening").

Young proceeded to a non-jury trial, before the Honorable Daniel J. Anders. The court found Young guilty of the above-mentioned offenses, and, on March 21, 2014, sentenced him to an aggregate term of five to ten years of incarceration, with a consecutive period of five years of probation. Young filed a timely motion for reconsideration of sentence that the trial court denied on June 20, 2014.

Young appealed, *nunc pro tunc*, on April 11, 2022.[11] Young and the trial court have complied with Pa.R.A.P. 1925.

---

[11] Young previously appealed his judgment of sentence on July 18, 2014. However, our Court found that Young's Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal failed to specify which elements of the listed offenses the Commonwealth did not prove beyond a reasonable doubt. Thereafter, Young filed a timely Post-Conviction Relief Act (PCRA) petition alleging ineffective assistance of counsel. On March 11, 2022, the trial court granted his petition and reinstated Young's appellate rights, *nunc pro tunc*, without opposition from the Commonwealth.

Young now raises the following issue on appeal: "[Did t]he [c]ourt lack subject matter jurisdiction because the evidence that the offense[s] occurred in Philadelphia is wholly unreliable[?]" Appellant's Brief at 6.

Young argues that the trial court lacks subject matter jurisdiction over this case due to M.A.'s "inconsistent and unreliable statements" about the alleged abuse that occurred in Philadelphia. *Id.*, at 5. Young details the discrepancies between the M.A.'s statements to the SVU detectives, her testimony at the preliminary hearing, and her trial testimony. Based on these inconsistencies, Young contends that "the trial court erred in finding that abuse occurred in Philadelphia as opposed to Ohio or New Jersey" and, consequently, the court lacked subject matter jurisdiction to hear this case. *Id.*, at 8. We disagree.

Subject matter jurisdiction implicates the authority of the court to hear and decide the type of controversy presented. *See Commonwealth v. Bethea*, 828 A.2d 1066, 1074 (Pa. 2003). As a pure question of law, our standard of review in determining whether a court has subject matter jurisdiction is *de novo*, and the scope of review is plenary. *See Commonwealth v. Jones*, 929 A.2d 205, 211 (Pa. 2007) (citation omitted).

The Courts of Common Pleas in Pennsylvania have statewide subject matter jurisdiction over cases arising under the Pennsylvania Crimes Code. *See Bethea*, 828 A.3d at 1074 (controversies arising out of violations of Crimes Code entrusted to original jurisdiction of courts of common pleas for resolution); *see also* 18 Pa.C.S.A. § 102. "Subject matter jurisdiction of a

criminal court extends to those offenses committed within the county of trial." **See Commonwealth v. McNeil**, 665 A.2d 1247, 1251 (Pa. Super. 1995). To establish subject matter jurisdiction in the trial court, the Commonwealth must present *prima facie* evidence that a criminal act occurred within the court's territorial jurisdiction. **See id.** *Prima facie* evidence establishes probable cause to warrant the belief that the accused committed the offense and each material element of the crime charged. **See Commonwealth v. Santos**, 876 A.2d 360, 363 (Pa. 2005) (citation omitted).

Here, Young argues that M.A. gave "inconsistent and unreliable" testimony at the preliminary hearing and trial. Appellant's Brief, at 5. "Questions concerning inconsistent testimony go to the credibility of the witnesses." **Commonwealth v. DeJesus**, 860 A.2d 102, 107 (Pa. 2004) (ellipses and citation omitted). "A determination of credibility lies solely within the province of the factfinder. Moreover, any conflict in the testimony goes to the credibility of the witnesses and is solely to be resolved by the factfinder." **Commonwealth v. Page**, 59 A.3d 1118, 1130 (Pa. Super. 2013) (citation omitted). The finder of fact is free to believe all, part, or none of the evidence. **See Commonwealth v. Bozic**, 997 A.2d 1211, 1223-24 (Pa. Super. 2010).

Young is asking us to reassess M.A.'s credibility. This we cannot and will not do. **See Bozic**, 997 A.2d at 1223; **see also Commonwealth v. Lyons**, 833 A.2d 245, 258 (Pa. Super. 2003) (uncorroborated testimony of complaining witness sufficient to convict defendant of sexual offenses;

inconsistencies within witness's testimony, alone, do not render evidence insufficient to support verdict).

As the sole finder of fact, Judge Anders found credible M.A.'s testimony that sexual acts occurred within Philadelphia. **See Page**, **supra**; **see also Bozic**, **supra.** "The Superior Court cannot deem incredible that which the fact-finder deemed worthy of belief." **Commonwealth v. Ratsamy**, 934 A.2d 1233, 1236 (Pa. 2007). Thus, we will not disturb the trial court's finding that the Commonwealth presented *prima facie* evidence of Young's criminal acts within the jurisdiction of the Court of Common Pleas of Philadelphia. **See McNeil**, **supra**. Based upon our review, we conclude that the trial court did not err in concluding that it had subject matter jurisdiction over the instant matter.[12] **See Jones**, **supra**.

Judgment of sentence affirmed.

_____

[12] In his brief, Young cites to **Commonwealth v. Bighum**, 307 A.2d 255 (Pa. 1973). However, he fails to cogently apply that case to the instant matter. We can only conclude that because his case was a bench trial, Young seems to be arguing that the trial judge committed reversible error because the court failed to instruct a jury about how to resolve disputed facts that affect jurisdiction. In a non-jury trial, the trial judge "is presumed to know the law," **Commonwealth v. McFadden**, 156 A.3d 299, 309 (Pa. Super. 2017), and great deference is "afforded to the trial court judge's discretion to adjudge the credibility of witnesses and to determine whether their testimony, if believed, establishes the elements of the offenses charged." **See Commonwealth v. Stays**, 70 A.3d 1256, 1267 (Pa. Super. 2013). We also follow a well-established standard that the findings of fact of the trial judge in a non-jury case shall have the same force and effect on appeal as a jury verdict. **See Commonwealth v. Chambers**, 310 A.3d 76, 89 (Pa. 2024). In this case, Young chose to waive his right to a jury trial and have his case tried before a trial judge.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/16/2024