J-A21020-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SHAMUS ARMSTED | |
| Appellant | No. 643 EDA 2013 |

Appeal from the Judgment of Sentence November 7, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006189-2011

BEFORE:  BOWES, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 17, 2014**

Shamus Armsted[1] brings this appeal from the judgment of sentence imposed on November 7, 2012, in the Court of Common Pleas of Philadelphia County.  A jury found Armsted guilty as an accomplice of two counts of aggravated assault by causing serious bodily injury, and two counts of recklessly endangering another person (REAP), as to two victims, Marcus Woods and Elisa Walker.[2]  The trial court sentenced Armsted to seven to 20 years' incarceration.  However, the trial court granted Armsted's

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The certified record also reflects the spelling of Appellant's surname as "Armstead".  For purposes of this appeal, we will refer to Appellant as "Armsted".

[2] 18 Pa.C.S. §§ 2702(a)(1), and 2705, respectively.

post sentence motion to arrest judgment with respect to the one count of aggravated assault relating to Elisa Walker, and reduced that count to simple assault. The trial court resentenced Armsted to a term of incarceration of six to 14 years. In this appeal, Armsted claims (1) the evidence was insufficient to support the guilty verdicts for aggravated assault and REAP "because the evidence failed to prove that [Armsted] aided and abetted the commission of the offenses," (2) the evidence was insufficient to support the guilty verdict for aggravated assault "because the evidence failed to prove that the victim, Marcus Woods, suffered 'serious bodily injury' as defined by Pennsylvania law," (3) "the cumulative effect of numerous instances of prosecutorial misconduct" violated his right to a fair trial, requiring the award of a new trial, and (4) the trial court erred in failing to instruct the jury, as requested by Armsted, regarding "mere presence." Armsted's Brief, at 4. Based upon the following, we affirm.

The trial court has aptly summarized the facts of this case as follows:

> [Armsted] entered a plea of not guilty and asserted his right to a jury trial. The sum and substance of the evidence introduced at trial is as follows:

> *Witness Testimony*

> On March 18, 2011, a group of protesters gathered on the corner of Hawthorne and Margaret Streets in Philadelphia. The group, which had been staging daily protests for about a week prior, had been organized by JaVese Phelps-Washington. Ms. Washington's 20 year-old son was shot and killed inside a bar located at the corner of Hawthorne and Margaret Streets on February 19, 2011. Following his death, the bar was closed for a

few weeks. When it re-opened, Ms. Washington organized the protests.

On March 18, 2011, one of the protesters was Marcus Woods, a young man known by the nickname "Cheese." Woods was "acting out of order," throwing rocks at the bar, opening the door and yelling at people inside, speaking over a bullhorn, and making gestures at surveillance cameras.

At approximately 11:18 p.m., [Armsted] and two other men arrived at the protest in a dark SUV. All three men exited the vehicle and [Armsted] said "What's up now, Cheese?" to Woods. Woods replied, "Go ahead with that." The two men from [Armsted's] SUV pulled out handguns and the protesters began to run away. One of the men then fired more than a dozen shots from two guns into the dispersing crowd. Immediately after the shooting, [Armsted] and one of the men that arrived with him got back into [Armsted's] SUV and left the area.

Woods and another protester, Elisa Walker, were both shot as they fled. Ms. Walker received a bullet graze wound to her leg for which she received treatment at an emergency room. Woods received treatment at Aria Hospital that night for a gunshot wound to his buttocks. At the hospital, police recovered the jeans and underwear that Woods was wearing that night. Each item of clothing had a bullet hole in the rear and massive blood stains.

During the days preceding the shooting, [Armsted] and his employees had made a number of complaints to the police about the protesters but they were dissatisfied with the police response. Several video surveillance cameras had been recently installed both inside and outside of the bar by [Armsted]. [Armsted] was able to access these cameras remotely.

*The Video*

Following the shooting on March 18, 2011, police recovered a video recording of the incident from the bar pursuant to a search warrant. The video shows [Armsted's] SUV arrive at approximately 11:17 p.m. However, [Armsted] parked his SUV in such a way that only a very small portion of the rear of the SUV is visible in the video footage.

On the video, the shooter from [Armsted's] SUV walks toward the crowd of protesters. As he does so, the protesters walk quickly away and some of them duck between parked cars. [Armsted] walks in the same direction as the shooter at this point.

The shooter then walks to the southwest corner of Hawthorne and Margaret Streets where the protesters had been gathered, raises both hands to chest height and begins shooting in the direction of the fleeing protesters. As he does so, [Armsted] continues to walk toward the shooter and stops when he gets to the southwest corner of Hawthorne and Margaret.

The shooter then runs in the direction of the fleeing protesters. [Armsted] then begins to walk backwards from the corner of Hawthorne toward his SUV while continuing to look in the direction of the shooter. Moments later, the shooter can be seen running in the direction of the SUV. The weight of [Armsted's] SUV then shifts twice within seconds before it pulls away from its parking spot at 11:18 p.m.

*[Armsted's] Testimony*

[Armsted] testified that he and his wife owned the bar in February and March of 2011. He had the video surveillance system installed and confirmed that he was able to view the surveillance cameras remotely so that he was always able to see what was happening there. [Armsted] testified that the protesters had been causing problems for the bar on a daily basis, including staging protests, threatening employees, vandalizing employee vehicles and throwing rocks.

[Armsted] claimed that he went to the bar at approximately 11:18 on March 11, 2011, to celebrate an employee's birthday and serve a cease and desist letter on Ms. Washington. The letter stated that the protests were provoking violence and directed Ms. Washington to have no further contact with the bar either inside or outside the premises.

[Armsted] further testified that he drove to the bar alone, but when he was about a block away he stopped because he saw some people standing around a van with broken windows. [Armsted] asked them if they worked at the bar and they replied

- 4 -

that they did not. One man was angry and stated Cheese was provoking the protesters to damage cars. [Armsted] asked the man to describe Cheese and the man said that he would show [Armsted] who Cheese was. [Armsted] then let that man and another stranger into his SUV and drove to the bar. [Armsted] parked the SUV in a "blind spot" of the video surveillance system.

When [Armsted] arrived at the protest with the two men, [Armsted] approached the crowd and asked "What's up, is this Cheese?" According to [Armsted], at this point the protesters started to run away and the men accompanying him began shooting at them. [Armsted] did not enter his bar, but instead got back in the SUV and drove away immediately. He did not call 911.

Later that night, [Armsted] found out that people were injured in the shooting, but did not contact the police or review the video surveillance. However, he did speak with a defense attorney and the attorney's investigator prior to his arrest.

[Armsted] testified that he rented the SUV. [Armsted] returned the rental car without contacting the police or allowing them to attempt to obtain fingerprints or other evidence with regards to the armed men that rode with him. [Armsted] was arrested a week after the shooting.

Trial Court Opinion, 8/23/2013, at 1–4 (record citations omitted).

As stated above, the jury found Armsted guilty as an accomplice of two counts of aggravated assault by causing serious bodily injury, and two counts of REAP, relating to the victims Woods and Walker. The jury acquitted Armsted of two counts of attempted murder, two counts of aggravated assault by attempting to cause serious bodily injury, two counts of aggravated assault by causing bodily injury with a deadly weapon, two counts of conspiracy to commit murder, two counts of conspiracy to commit aggravated assault, one count of carrying a firearm without a license, and

one count of possession of an instrument of crime.[3]  As previously discussed,
the trial court ultimately imposed an aggregate sentence of six to 14 years'
incarceration.  This appeal followed.[4]

Armsted first contends the evidence was insufficient as a matter of law
to support the guilty verdicts for aggravated assault by causing serious
bodily injury and REAP because the evidence failed to prove that he aided
and abetted the commission of the offenses.

Our standard of review is well settled:

> A claim challenging the sufficiency of the evidence is a
> question of law. Evidence will be deemed sufficient to
> support the verdict when it establishes each material
> element of the crime charged and the commission thereof
> by the accused, beyond a reasonable doubt. Where the
> evidence offered to support the verdict is in contradiction
> to the physical facts, in contravention to human
> experience and the laws of nature, then the evidence is
> insufficient as a matter of law. When reviewing a
> sufficiency claim the court is required to view the
> evidence in the light most favorable to the verdict winner
> giving the prosecution the benefit of all reasonable
> inferences to be drawn from the evidence.

We must defer to the finder of fact at the time of trial:

> The evidence established at trial need not preclude every
> possibility of innocence and the fact-finder is free to
> believe all, part, or none of the evidence presented. It is

---

[3] 18 Pa.C.S. §§ 901, 2702(a)(1), 2702(a)(4), 903, 6106(a)(1), and 907(a), respectively.

[4] Armsted timely complied with the court's order to file a statement of errors complained of on appel pursuant to Pa.R.A.P. 1925(b).

not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

Furthermore, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.

**Commonwealth v. Toritto**, 67 A.3d 29, 33 (Pa. Super. 2013) (quotations and citations omitted), *appeal denied*, 80 A.3d 777 (Pa. 2013).

We begin by setting forth the definitions of the relevant crimes. A person may be convicted of Aggravated Assault graded as a first degree felony if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1).[5] "Serious bodily injury" is defined as "[b]odily injury which

---

[5] As previously mentioned, the jury found Armsted guilty of two counts of aggravated assault by causing serious bodily injury, and acquitted Armsted of two counts of aggravated assault by attempting to cause serious bodily injury.

Also, as stated above, the trial court granted Armsted's post-sentence motion in part, and arrested judgment with respect to one count of aggravated assault by causing serious bodily injury, as to Elisa Walker, and reduced that count to simple assault.

creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

Section 2705 of the Crimes Code, pertaining to REAP, provides that "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705.

An accomplice is legally accountable for the conduct of another person involved in committing the crimes. 18 Pa.C.S. § 306(b)(3). The Crimes Code defines an accomplice as follows:

> A person is an accomplice of another person in the commission of an offense if:
>
> (1) with the intent of promoting or facilitating the commission of the offense, he:
>
> (i) solicits such other person to commit it; or
>
> (ii) aids or agrees or attempts to aid such other person in planning or committing it[.]

18 Pa.C.S. § 306(c). "All theories that are recognized under our law to hold one responsible for the criminal acts of another require the existence of a shared criminal intent." ***Commonwealth v. Cox***, 353 A.2d 844, 846 (Pa. 1976) (citations omitted).

> A defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the scene. However, the circumstances change if there is additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. The

amount of aid "need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime." ***Commonwealth v. Murphy***, 577 Pa. 275, 286, 844 A.2d 1228, 1234 (2004).

***Toritto, supra***, 67 A.3d at 35.

Here, Armsted argues that the Commonwealth failed to proved that there was a shared criminal intent between himself and the shooter. Specifically, Armsted asserts:

[T]he Commonwealth did not contend that [Armsted] was the actual shooter. There was also no suggestion at trial that [Armsted] even possessed a firearm, or acted as a lookout, or otherwise did anything to aid or encourage the gunman to fire shots at anyone. Indeed, there is no evidence that, prior to getting out of the SUV, he even knew that the other men were armed.

Armsted's Brief at 18. In support of this argument, Armsted points to ***Commonwealth v. Menginie***, 383 A.2d 870 (Pa. 1978), ***Commonwealth v. Johnson***, 513 A.2d 476 (Pa. Super. 1986), ***Commonwealth v. Cunningham***, 447 A.2d 615 (Pa. Super. 1981), and ***Commonwealth v. Fields***, 333 A.2d 745 (Pa. 1975). Based upon our review, we conclude the cited cases are distinguishable, and Armsted's argument is without merit.

In ***Menginie***, a verbal confrontation between the occupants of two cars at a drive-in restaurant quickly escalated to a point where Menginie and all but one of the other occupants of both cars alighted from their vehicles, at which point the passenger who remained in Menginie's vehicle exited, drew a gun, and fatally shot the victim. Menginie and his passengers then drove away. ***Menginie***, 382 A.2d at 871–872. Menginie was convicted of,

*inter alia*, voluntary manslaughter and conspiracy. On appeal, the Pennsylvania Supreme Court reversed Menginie's convictions and discharged him, finding:

> There is no indication that appellant had ever met or known the victim prior to this encounter, thus no inference can be drawn that revenge or vindication was the basis for an agreement to 'get' the victim. More importantly, there is no evidence that appellant encouraged, acquiesced in, or even knew that the person in the rear seat had a gun, or that he intended to use it.

*Id.* at 872. The **Menginie** Court concluded: "We hold that on the present record the prosecution has failed to establish an agreement or common understanding, either explicit or implied, formed either before or during this confrontation, to commit the act for which appellant was charged." *Id.* at 873.

In **Johnson**, three men, including Johnson, and a woman were exiting a bar at the precise moment the victim rode past the bar on his bicycle. One of the men with Johnson said, "Here comes a white boy. Let's get him." **Johnson**, 513 A.2d at 477. Shortly after those words were spoken, another man pulled out a gun and fatally shot the victim. Johnson fled with the other men and woman. *Id.* Johnson was convicted of conspiracy to commit murder and/or robbery. On appeal, this Court reversed the judgment of sentence, finding "there was no overt evidence of an agreement that included Johnson in which he assented to go along with the commission of the crime." *Id.* at 478.

In *Cunningham*, a panel of this Court reversed a third degree-murder conviction based upon accomplice liability where the evidence showed that Cunningham beat the victim's leg with a baseball bat, but the fatal blow clearly came from Cunningham's co-defendant, who struck the victim with a piece of wood while Cunningham attempted to stop the co-defendant. Cunningham was observed chasing the victim through a vacant lot, detaining him by hitting him in the leg with a baseball bat, and identifying him to the co-defendant as the person who had burglarized the co-defendant's apartment. *Id.* at 616–617. When the co-defendant caught up, he beat the victim with an ax handle. *Id.* at 616. Other testimony revealed that Cunningham did not see the co-defendant approaching with a piece of wood and that he attempted to stop the co-defendant. *Id*. This Court found that Cunningham's identification and detainment of the victim, in light of the totality of the circumstances, were insufficient to prove accomplice liability.

In *Fields*, the defendant was charged and convicted of murder and conspiracy. The evidence at trial established that Fields and his co-conspirator approached the victim as he sat on a set of stairs and one of the men asked if the victim was "from 29." *Id.* at 746. Before the victim could respond, the co-conspirator shot him five times. The men fled and a witness saw the defendant "move his hands 'down into his pants ... Like he had something under his shirt.'" *Id.* The Pennsylvania Supreme Court reversed

the judgment of sentence, reasoning: "There is nothing in the testimony to indicate Fields had any prior knowledge of [his cohort's] lethal intent or that he in any way counseled or participated in the shooting." *Id.* at 747.

In all of these cases there was a lack of evidence of shared criminal intent between the defendants and the actors who committed the crimes because the situations developed in spontaneous and unanticipated ways.[6] The present case contrasts with the cited cases.

Here, there was evidence that Armsted was angry with the protestors, that he was dissatisfied with the police response, that Woods was a protestor who particularly misbehaved on the night of the shooting, that Armsted had remote access to video surveillance of the inside and outside of the bar, and that Armsted drove an SUV with two men, including the shooter, to the location of the protestors. Armsted approached, asked which protestor was Woods, and at that point gunfire erupted. The video shows the shooter with both arms raised, chasing individuals who are running away. The video also shows Armsted walking in the direction of the shooter, then walking backward, and looking in the direction of the shooter. After the

_____

[6] Both conspiracy and accomplice liability require proof of shared intent, but accomplice liability does not require proof of an agreement as conspiracy does. *See Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa. Super. 2002), *affirmed*, 844 A.2d 1228 (Pa. 2004). We note that *Menginie*, *Johnson* and *Fields* were cases involving conspiracy convictions. We further note that, in the present case, the jury acquitted Armsted of conspiracy, specifically, two counts of conspiracy to commit murder, and two counts of conspiracy to commit aggravated assault.

shooting, the shooter is seen running in the direction of the SUV. Armsted returns to the SUV. The SUV then shifts slightly downward just before it leaves the parking spot. Armsted did not contact police. Additionally, he returned the rented SUV without making it available to police for possible evidence relating to the men who rode with him.

Armsted's position on appeal asks us to draw inferences from the evidence that are favorable to him rather than the Commonwealth, which is contrary to our standard of review. Moreover, the jury was entitled to disregard Armsted's account of the incident. *See Commonwealth v. Rosario-Hernandez*, 666 A.2d 292, 296 (Pa. Super. 1995) ("It is the function of the jury to pass upon the credibility of the witnesses and to determine the weight to be accorded the evidence produced. The jury is free to believe all, part or none of the evidence introduced at trial." (citation omitted)). Finally, the jury's verdict is fully supported by the reasonable inferences from the Commonwealth's evidence that Armsted either solicited the shooter or aided him by driving him in the SUV to and from the scene, and by returning the rented SUV without contacting police and giving them access to the vehicle for possible evidence. Therefore, we agree with the conclusion of the trial court that based upon the evidence,

> the jury could have found that [Armsted] had the intent of promoting or facilitating the shooting and that he solicited the shooter to fire or aided the shooter in planning or perpetrating the shooting. Under Pennsylvania law, this makes [Armsted] criminally responsible for each of the crimes as an accomplice. *See* 18 Pa.C.S.A. § 306.

- 13 -

Trial Court Opinion, 8/23/2012, at 8.  Accordingly, we reject Armsted's first sufficiency challenge.

Armsted also claims the evidence was insufficient to sustain the guilty verdict for aggravated assault by causing serious bodily injury to Marcus Woods.  Armsted argues that because the jury acquitted him of the aggravated assault by attempting to cause serious bodily injury to Woods, "the issue now before this Court is whether the evidence established that Marcus Woods actually suffered 'serious bodily injury' as defined by the Crimes Code." Armsted's Brief, at 28.[7]  **See** 18 Pa.C.S. § 2702(a)(1) ("A person is guilty of aggravated assault if he … attempts to cause serious bodily injury to another, **or causes** such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" (emphasis added)).

As stated above, "serious bodily injury" is defined in the Crimes Code as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.  Armsted maintains the gunshot wound in Woods's right buttocks did not qualify as

---

[7] Armsted asserts, "The lower court properly arrested judgment on the count relating to Elisa Walker, finding that the evidence failed to show that Elisa Walker suffered 'serious bodily injury' as defined by Pennsylvania law." Armsted's Brief, at 27.

"serious bodily injury." Armsted relies on the evidence showing that Woods was completely ambulatory when he walked into the hospital emergency room and upon discharge, that he was released after four hours of outpatient treatment, and that he did not require sutures or antibiotics. We are not persuaded by this argument.

Here, Woods suffered a penetrating entry wound to his right buttocks, with the bullet able to be felt in the right hip region. *See* Trial Court Opinion, 8/23/2013, at 9; Exhibit B. His pants and underwear were "saturated" with blood. *Id.*; Exhibit A. Given this evidence, we agree with the trial court that the penetrating gunshot wound suffered by Woods qualifies as a "serious bodily injury." *See e.g., Commonwealth v. Daniels*, 354 A.2d 538, 539 (finding defendant caused serious bodily injury for purposes of aggravated assault where victim was struck by bullet which remained in his body because doctor recommended against removal). Moreover, as the trial court pointed out, "[t]he massive blood loss suffered by Woods was sufficient for the jury to find there was a substantial risk that he could have bled to death if not for the emergency medical treatment he received." *Id.* at 10. *See Commonwealth v. Kramer*, 371 A.2d 1008, 1013 (Pa. Super. 1977) (evidence sufficient to establish aggravated assault where doctor's testimony that defendant beat children on buttocks, causing bruising and ruptured blood vessel; defendant "did not only attempt to cause serious bodily injury, but actually did cause such injuries"); *see also*

*Commonwealth v. Payne*, 868 A.2d 1257, 1262 (Pa. Super. 2005), (upholding aggravated assault—serious bodily injury conviction where victim was shot in back; "fact that [victim] did not die was just blind luck"), *appeal denied*, 877 A.2d 461 (Pa. 2005). Accordingly, we find no error in the trial court's determination that the Commonwealth established the gunshot wound suffered by Woods was a "serious bodily injury" within the definition of 18 Pa.C.S. § 2301.

In summary, neither of Armsted's challenges to the sufficiency of the evidence presents a basis upon which to disturb the judgment of sentence.

Next, Armsted contends "the cumulative effect of numerous instances of prosecutorial misconduct that permeated the trial up to and including the prosecutor's closing argument violated the defendant's right to a fair trial and requires the award of a new trial." Armsted's Brief, at 4, 32. In support of his position, Armsted argues the prosecutor (1) repeatedly referenced pre-arrest photographic identifications of Armsted, (2) made numerous unfounded suggestions that other criminal activity was associated with the bar that by implication was attributable to Armsted as its owner, (3) argued facts not in evidence by suggesting that Armsted said he was going to fix the problems himself with the protestors, and that Armsted and his supporters had threatened witnesses. *See* Armsted's Brief, at 32.

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v.*

*Helsel*, 53 A.3d 906, 920 (Pa. Super. 2012) (citation omitted), *appeal denied*, 63 A.3d 1244 (Pa. 2013).

With regard to Armsted's first claim, regarding the prosecutor's references to pre-arrest photographic identifications of Armsted, the record reflects that the counsel objected and moved for a mistrial. **See** N.T., 6/6/2012, at 197, 202.

The Pennsylvania Supreme Court has rejected the suggestion that any trial reference to a defendant's photograph in police possession is prejudicial *per se*. **Commonwealth v. Washington**, 927 A.2d 586, 605 (Pa. 2007). Instead,

> after the reference to a photograph the controlling question is whether or not a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity. A mere passing reference to photographs from which a reasonable inference of prior criminal activity cannot properly be drawn does not invalidate the proceedings since there has been no prejudice as a result of the reference; so too, where it appears on the face of the record that there is an explanation of the police possession of the photograph unrelated to any inference of prior criminal activity.

**Id.** at 605 (citations omitted).

Here, the trial court reasoned that the reference was "fleeting and solitary," and that, since there was evidence that Armsted had cooperative dealings with police in the month before the shooting, it was "unlikely that the jury would have inferred that the photo in question was an arrest photo and that [Armsted] had a prior criminal record." Trial Court Opinion,

8/23/2013, at 11. Our review reveals no abuse of discretion in the trial court's determination.

With regard to Armsted's complaint that the prosecutor suggested that Armsted was involved with other criminal activity was associated with operating a nuisance bar, the record reflects the offending comment was made by the Commonwealth's witness, Ms. Washington, who stated that the bar "had a long history of shootings,"[8] and that trial counsel interposed an objection and requested a curative instruction. *See* N.T., 6/1/2012, at 126–127; 6/4/2012, at 4, 38–39. The trial court sustained counsel's objection and gave a curative instruction as requested. *See* N.T., 6/4/2012, at 38–39. The jury is presumed to have followed the instructions of the Court. *See Commonwealth v. Spotz*, 896 A.2d 1191, 1224 (Pa. 2006). Therefore, Armsted's complaint is without merit.

Finally, Armsted contends that the prosecutor mischaracterized the evidence by suggesting in her closing that Armsted admitted to wanting to "fix the problem" himself with the protestors and that Armsted and/or his supporters had threatened witnesses.

> [T]he prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence. In considering a claim of prosecutorial misconduct, our inquiry is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one. Thus, a prosecutor's remarks do not constitute

---

[8] N.T., 6/1/2012, at 127.

reversible error unless their unavoidable effect . . . [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Bozic*, 997 A.2d 1211, 1229 (Pa. Super. 2010) (citation and internal citations omitted), *appeal denied*, 13 A.3d 474 (Pa. 2010), *cert. denied*, 131 S. Ct. 2939 (2011).

Here, with regard to the comments in the closing argument of the prosecutor cited by Armsted, the trial court sustained trial counsel's objections, and gave curative instructions. *See* N.T., 6/12/2012, at 5, 6–7. In its Rule 1925(a) opinion, the trial court opined that the prosecutors' remarks do not require reversal. The trial court reasoned:

> [Armsted] next argues that the Assistant District Attorney implied that witnesses had been threatened by [Armsted] and/or his supporters. During closing argument, the prosecutor suggested that several witnesses were afraid to testify. N.T., Trial Volume I, 6/11/2012, at 184–191, 213–214. A natural inference from her suggestion was that the witnesses were afraid of [Armsted]. The Court sustained [Armsted's] objection and gave the following curative instruction:
>
>> And the final objection had to do with sentiment that [the prosecutor] conveyed to you towards the end of her closing, where she asked you to use courage in rendering your verdict. I'm asking you to disregard that comment.
>
> N.T., Trial Volume I, 6/12/2012, at 7.
>
> While the prosecutor's implications were certainly unjustified, this Court cannot conclude that the unavoidable effect of the comments was to compromise the ability of the jury to render a true verdict. Given the curative instruction and the jury's split decision, the Court concludes that the verdict was based upon an objective and careful weighing of the evidence.

- 19 -

Finally, [Armsted] claims that during closing argument, the Assistant District Attorney attributed statements to the police officers and to [Armsted] which those witnesses did not make. The prosecutor told the jury that during the meeting between [Armsted] and police that occurred on the day of the shooting, the police "basically told him, 'This is your business, this is your problem, you fix it … We helped you as much as we can. This is your problem.'" N.T., Trial Volume I, 6/11/2012, at 195-196. (emphasis supplied) [sic]. She went on to argue that, as a result of his admitted dissatisfaction with the police response to the protestors and the behavior of Woods and other protestors, [Armsted] decided to fix the problem himself:

And do you know what the defendant said to himself? He said, If you're going to do something right, you've got to do it yourself. That's what he said.

N.T., Trial Volume I, 6/11/2012, at 196.

The transcript reflects that the prosecutor qualified the purported statements of police with the word "basically." With respect to the supposed soliloquy by [Armsted] [deciding to fix the problem himself], it is clear from the context of the entire argument and the trial record that the prosecutor fairly argued to the jury that they should infer that [Armsted] determined that he would take matters into his own hands. However, in an effort to purge any improper considerations from the jurors' minds during deliberations, this Court gave the following curative instruction regarding the prosecutor's comments about the meeting:

[The prosecutor] referenced that at that meeting [Armsted] was told that his bar, to paraphrase, was a problem and [defense counsel] objected. I'm going to sustain that objection. Obviously, it is your recollection that controls. There was, we believe, testimony that … the protests were part of the meeting and perhaps the homicide that had been committed the week or weeks before; there wasn't any direct evidence stating that he was told that his bar was a "problem," quote unquote. So that objection is sustained.

N.T., Trial Volume I, 6/12/2012, at 5–6.

- 20 -

Viewing the prosecutor's closing argument, which encompassed more than 30 pages of the trial transcript, as a whole, as well as the Court's instructions, this Court cannot conclude that these comments caused the jurors to form a fixed bias and hostility toward [Armsted] in their minds or prevented them from weighing the evidence objectively and rendering a true verdict. Thus, any misconduct by the prosecutor does not warrant a new trial.

Trial Court Opinion, 8/23/2013, at 17–19.

The trial court has fully addressed Armsted's arguments, the relevant portions of the record, its curative instructions, and justified its conclusion that Armsted was not prejudiced by the prosecutor's comments during closing argument. We discern no abuse of discretion in the trial court's analysis.

In sum, based on our review of Armsted's contention that he is entitled to a new trial based upon the "cumulative effect of numerous instances of prosecutorial misconduct," we conclude no relief is due. It is well settled that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Williams*, 615 A.2d 716, 722 (Pa. 1992). Armsted has failed to demonstrate that any of his claims of prosecutorial misconduct warrant relief individually, and they do not do so when considered collectively.

Finally, Armsted contends that the trial court committed reversible error in failing to give the jury a set of specific instructions, as requested by Armsted.

> [W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014) (citation omitted), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Here, Armsted contends that the trial court committed reversible error in failing to instruct the jury "that his mere presence at the scene of the crime, knowledge of [a crime's] commission, and flight from the scene, even with the shooter if they so found, was insufficient to convict him." Armsted's Brief, at 36. In support of his argument, Armsted cites *Commonwealth v. Henderson*, 378 A.2d 393 (Pa. Super. 1977). Armsted's reliance on *Henderson* is misplaced.

In *Henderson*, the instruction at issue recited in general terms the applicable law on the subjects of accomplice liability and conspiracy. *See id*. at 400. This Court reversed and remanded for a new trial because the jury instruction was lacking and prejudicial for not setting forth the significance or insignificance of mere presence without any other evidence. *See id*. at 400. *Henderson* is distinguishable from the present case.

Here, the trial judge instructed the jury on accomplice liability, stating:

> There was an objection about accomplice liability and I'm sustaining that objection as I'll also mention later, if someone helps someone escape after a crime is committed, that in and of

itself would not make them culpable as an accomplice for the crime that was committed. Just helping someone escape, if that's all there was, would not be enough to make you an accomplice for purposes of the law. So I wanted to clarify that and also give you a much fuller instruction on accomplice liability later.

****

There are [two] basic ways that one defendant may be criminally responsible for conduct committed by another person or persons. These two ways may apply, even if the defendant in question was not present at the time and place when a particular act occurred. And here I'm talking about conspiratorial liability and accomplice liability. And just to make this clear for you, there is an agreement among everyone here that the defendant did not shoot at anyone that evening. However, if you find that he meets the requirement beyond a reasonable doubt for being an accomplice, a conspirator or both in this case, then you can find him guilty of the underlying charges, even though he didn't actually shoot at anyone.

****

There is a second and separate way one defendant can be liable for the conduct of another person or persons; that is, when the defendant is an accomplice of the person who actually commits the crimes at issue. There is a basic difference between being an accomplice and being a conspirator. In a conspiracy, people agree to act jointly. To be an accomplice, a person does [not] have to agree to help someone else. The person is an accomplice if he or she on his or her own act helps the other person commit another crime. More specifically, the defendant is an accomplice of another for a particular crime if the following two elements are proven beyond a reasonable doubt:

A, that the defendant had the intent of promoting or facilitating the commission of that crime and; B, the defendant solicits, commands, encourages or requests the other person to commit it or aids, agrees to aid or attempts to aid the other person in planning or committing the crime.

**It is important to understand that a person is not an accomplice merely because he or she was present when a crime was committed or knows that a crime is being committed. And again, it is not enough for the Commonwealth to show that a person helped someone flee after a crime was committed in and of itself to make someone an accomplice.** …

N.T., 6/12/2012, at 6–7, 16–19 (emphasis added). ***See also*** Trial Court Opinion, 8/23/2013, at 14–15.

As is evident from the above excerpt, the trial judge's instruction specifically conveyed to the jury that Armsted's "mere presence" and knowledge of the crime alone would not be sufficient to make him an accomplice. The trial court's instruction tracks the language of Pennsylvania Suggested Standard Jury Instruction (Crim) 8.306(a). As such, we discern no abuse of discretion. ***See Commonwealth v. Harris***, 979 A.2d 387, 395 (Pa. Super. 2009) (finding no abuse of discretion in trial court's failure to give defendant's requested "mere presence" instruction where the substance of the proposed charge was included the Standard Jury Instructions, and thus was covered by the conspiracy charge).[9] ***See also Commonwealth v. Reid***, 99 A.3d 427, 455 (Pa. 2014) (rejecting ineffectiveness claim for failing to raise on direct appeal trial court's refusal to give requested mere presence

---

[9] In ***Harris***, the trial judge had rejected Harris's proposed "mere presence" instruction, finding that the concept was covered in the conspiracy charge and was therefore not necessary. The trial judge explained that since the filing of ***Henderson***, the decision on which Harris based his proposed instruction, the Standard Jury Instructions had been revised to incorporate the findings of that case. ***See Harris***, 979 A.2d at 395 n.9.

instruction; jury was instructed as to the elements of the crimes charged and, with respect to the accomplice charge, that "[a] defendant does not become an accomplice merely by being present at the scene or knowing about a crime"). Accordingly, we reject Armsted's challenge to the jury charge as meritless.

Having reviewed the contentions of Armsted, and finding no basis upon which to disturb the judgment of sentence, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/17/2014