J-S59045-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MATTHEW WOLFE | : | |
| | : | |
| Appellant | : | No. 3553 EDA 2017 |

Appeal from the Judgment of Sentence June 13, 2017
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s):  CP-39-CR-0000423-2016

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED JANUARY 31, 2019**

Matthew Wolfe appeals the judgment of sentence imposed on June 13, 2017, in the Court of Common Pleas of Lehigh County.  A jury found Wolfe guilty of third-degree murder and endangering the welfare of a child, stemming from the death of his two-month-old daughter.[1]  The trial court sentenced Wolfe to an aggregate term of 20 to 40 years' imprisonment.  In this appeal, Wolfe raises six claims, challenging the trial court's denial of his request for a mistrial, refusal to charge the jury on involuntary manslaughter, several evidentiary rulings, and alleging cumulative prejudice.  Based on the following, we affirm.

The facts are well known to the parties and are set forth in an extensive summary in the trial court's opinion.  Therefore, we simply reiterate portions

_____

[1] 18 Pa.C.S. §§ 2502(c), and 4304(a)(1), respectively.

of the trial court's detailed factual summary to provide context for the claims raised in this appeal:

On November 12, 2013, at approximately 2:00 p.m., Quinn Wolfe, a two-month-old infant girl, was transported by her father, Matthew Wolfe, hereafter [Wolfe], to St. Luke's Hospital located in Bethlehem, Lehigh County, Pennsylvania. Cristen Sanchez, the infant's mother, was employed by St. Luke's Hospital and the baby was brought to her by [Wolfe]. Shortly after arriving at the hospital, Dawn Bast, a registered nurse, observed the infant to be in distress and instructed her mother to take the infant to the emergency department immediately. When the infant was examined in the emergency room, multiple traumatic injuries were discovered on the infant's body. The infant was listed in critical condition and flown to St. Christopher's Hospital in Philadelphia, Pennsylvania. On November 18, 2013, approximately six days later, the infant Quinn was taken off life support and pronounced dead. An autopsy revealed that neurotrauma was the cause of death. A homicide investigation followed.

****

Whitehall Township Police Department launched an investigation immediately upon the child's arrival in Philadelphia. The case involved interviewing witnesses, medical records, and gathering information relating to the death of the infant. Detective Kevin Smith of the Lehigh County District Attorney's Office interviewed [Wolfe] while Quinn was being treated at St. Christopher's Hospital in Philadelphia, Pennsylvania. The interview was audio and video recorded and played for the jury. [Wolfe] denied shaking Quinn. The investigation stalled. Detectives faced difficulty on the timeline of Quinn's injuries and the burden of proof to make an arrest. In 2015, the case was resumed when a child abuse expert [Dr. Debra Esernio-Jenssen] was able to identify when the lethal event took place which caused Quinn's unfortunate death. On December 22, 2015, [Wolfe] was arrested for the murder of his baby daughter Quinn Wolfe.

Commonwealth expert Dr. Debra Esernio-Jenssen was asked to review Quinn's medical records. Dr. [Esernio-]Jenssen is a pediatrician and Section Chief of Child Protection Medicine at Lehigh Valley Hospital. Dr. [Esernio-]Jenssen is board certified in

- 2 -

pediatrics and child abuse pediatrics. Dr. [Esernio-]Jenssen reviewed the medical records and history provided to the medical providers at both St. Luke's and St. Christopher's Hospital. Dr. [Esernio-]Jenssen discussed the process of evidence-based medicine. She explained it significant that [Wolfe] provided a history that indicated that his baby, Quinn, fed uneventfully three (3) to three and a half (3½) ounces, was put down on her back, and was fine. Dr. [Esernio-]Jenssen testified that a baby who suffered severe significant brain trauma that ultimately led to her demise would not be able to take three (3) to three and a half (3½) ounces of formula uneventfully and act normally. A child that suffers abusive head trauma would immediately show signs or symptoms. The infant would not have been able to feed, open her eyes, or be alert after suffering from such severe neurologic injuries. Dr. [Esernio-]Jenssen further explained that the lethal event occurred between a time she was acting "normal" and the time when she was brought to the hospital. Based upon a review of the circumstances Dr. [Esernio-]Jenssen opined the baby was grasped, violently shaken, and slammed. The only person that was alone with Quinn at such time was [Wolfe].

During cross-examination the Defense was permitted to impeach Dr. [Esernio-]Jenssen in a variety of ways. However, the Defense was not permitted unfettered cross-examination of the witness.

The Defense expert, Dr. William Manion, did not appear for trial. On or about March of 2016 the Defense retained Dr. Manion as an expert witness. On Saturday, January 21, 2017, Dr. Manion confirmed his court appearance through email correspondence with the Defense. On Monday, January 23, 2017, Dr. Manion was scheduled for a dinner reservation with defense counsel but never arrived. When defense counsel reached out, Dr. Manion assured the Defense that he would be present for trial. On Tuesday, January 24, 2017, Dr. Manion did not show for his scheduled court appearance. All attempts to contact Dr. Manion failed until approximately 11:30 a.m., when defense counsel received a call on his cellular telephone. Dr. Manion apologized and vowed that he would be present for court the following day. On Wednesday, January 25, 2017, Dr. Manion again failed to appear and the Defense requested a mistrial. This Court considered a continuance for a material witness warrant, but learned Dr. Manion is from out-of-state and was never subpoenaed. Further continuances would also prejudice the Commonwealth because their rebuttal expert

would be unavailable. After a lengthy discussion in chambers, a solution was provided by the Commonwealth stipulating to Dr. Manion's expert report. Dr. Manion's report was subsequently read verbatim to the jury. [The Court explained to the jury that Dr. Manion had experienced an unforeseen personal emergency that kept him from appearing, and would be unable to appear for the next couple of days. Defense counsel was permitted to present portions of Dr. Manion's CV and the entire report consisting of ten pages and a conclusion.]

Dr. Manion is an expert in forensic pathology. He reviewed the relevant medical records and other documents to formulate an opinion on whether [Wolfe] caused the death of his daughter Quinn Wolfe by purportedly inflicting injuries upon her on November 12, 2013. Dr. Manion did not believe that Dr. [Esernio-]Jenssen's opinion was supported by the facts or by sound medical conclusions. In his opinion, Quinn likely suffered a small subdural hematoma that later bled in an acute fashion when Quinn choked on her formula and had a spell of hypoxia in the crib. Dr. Manion believed, to a reasonable degree of medical certainty, that Quinn's injuries were not inflicted on that day, but rather were days or weeks old.

The Commonwealth called Dr. Lori Frasier in rebuttal. Dr. Frasier is employed by Penn State Health Medical Center, Penn State Health Children's Hospital, and Penn State Hershey College of Medicine, as a physician, pediatrician, child abuse pediatrician, and a professor of pediatrics. She is board certified as a pediatrician. Dr. Frasier reviewed Dr. Manion's report, Dr. Esernio-Jenssen's report, and the medical records for Quinn Wolfe. Dr. Frasier indicated Dr. Manion relied on records attributed to Dr. McColgan of St. Christopher's Hospital. When Dr. Frasier reviewed Dr. McColgan's report she noticed discrepancies. Dr. Frasier called Dr. McColgan. She was surprised by some of the statements Dr. Manion attributed to Dr. McColgan, partly because they seemed outside the norm of what a child abuse pediatrician would say.

Dr. Frasier clarified Dr. Manion's conclusion to the jury. However, Dr. Frasier explained that there was no sound evidence-based medicine that supported a cough or choke could cause a rebleed of an existing subdural hematoma. In addition, Dr. Manion was misleading when discussing no acute fractures. Quinn's skull fracture was an acute or new fracture. The child's leg had a fracture, called a metaphyseal fracture, near her ankle which was

- 4 -

deemed acute. The metaphyseal fracture stands out because it is an injury highly indicative of an abusive event. Further, Dr. Manion failed to address the eye pathology reports of eye damage.

Dr. Frasier opined, to a degree of medical certainty, that Quinn suffered a serious violent head injury in the moments before she became symptomatic from which she never recovered. If Quinn was already injured, she would not have been able to take a bottle. She would not have interacted with her environment in any way that was normal for a child of her age. Her color would have been off, her muscle tone would have been abnormal, and she would have looked like a child in distress. She would never have looked "normal" after the event occurred. In her opinion, it was clear that Quinn suffered from shaking and impact.

On January 26, 2017, [Wolfe] was found guilty of Murder in the Third Degree and Endangering the Welfare of a Child.

Trial Court Opinion, 12/22/207, at 4, 11-15 (footnotes omitted).

Following the jury verdict, Wolfe filed a post-sentence motion, which was denied, and this appeal followed.[2]

_____

[2] This Court notes that the trial court initially sentenced Wolfe on March 17, 2017. After Wolfe filed his post-sentence motion on March 27, 2017, the trial court, on April 20, 2017, entered an order vacating the judgment of sentence. On June 13, 2017, the trial court re-sentenced Wolfe and entered a separate order finding the previously filed, March 27, 2017, post-sentence motion to be timely filed in light of the resentencing. On July 13, 2017, the Commonwealth filed a response in opposition to Wolfe's March 27, 2017 post-sentence motion. On October 10, 2017, the trial court denied Wolfe's post-sentence motion. On October 17, 2017, the trial court entered an amended order, denying the post-sentence motion and directing Wolfe to file an appeal within thirty days. Wolfe filed a notice of appeal on October 31, 2017.

In light of the foregoing procedure, namely, that after Wolfe filed his post-sentence motion, the trial court vacated the original sentence, resentenced Wolfe, and issued an order finding the previously filed post-sentence motion to be pending, we are compelled to call attention to Pennsylvania Rule of Criminal Procedure 720(B)(3), which provides that "[t]he

Wolfe raises the following six claims:

1. The trial court erred and violated Mr. Wolfe's state and federal due process rights by refusing to grant his request for a mistrial after his most important witness, Dr. Williams Manion, failed to appear for trial, despite repeatedly informing trial counsel he would appear.

2. The trial court erred and violated Mr. Wolfe's state and federal due process rights by refusing to charge the jury with involuntary manslaughter despite the fact Mr. Wolfe presented sufficient evidence to warrant an involuntary manslaughter charge.

3. The trial court erred and violated Mr. Wolfe's state and federal due process rights by prohibiting Mr. Wolfe from presenting Dr. Holly Warholick[3] to discuss the nature and severity of Cristen Sanchez's post-partum depression.

4. The trial court erred and violated Mr. Wolfe's state and federal due process and confrontation rights by prohibiting Mr. Wolfe from cross-examining Dr. Esernio-Jenssen regarding seven cases where courts and experts contradicted her shaken baby and/or child abuse findings.

5. The trial court erred by striking the entirety of Mr. Wolfe's character testimony regarding his peaceful and non-violent reputation. Appellate counsel was ineffective for failing to raise this claim in Mr. Wolfe's concise statement of errors.

6. The trial court's cumulative errors violated Mr. Wolfe's state and federal due process right to a fundamentally fair trial.

Wolfe's Brief at 2.

---

judge shall not vacate sentence pending decision on the post-sentence motion."

[3] The correct spelling is Dr. Holli Warholic.

In his first issue, Wolfe contends the trial court erred and violated his state and federal due process rights by refusing to grant his request for a mistrial after his most important witness, Dr. William Manion, failed to appear for trial, despite repeatedly informing trial counsel he would appear.

> The following standards apply to our review of a trial court's denial of a motion for a mistrial:
>
> The trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, … assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.
>
> "The remedy of a mistrial is an extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal."

*Commonwealth v. Bozic*, 997 A.2d 1211, 1225-26 (Pa. Super. 2010) (citations omitted), *appeal denied*, 13 A.3d 474 (Pa. 2010), *cert. denied*, 563 U.S. 1025 (2011).

As stated above, after Dr. Manion failed to appear at trial, trial counsel moved for a mistrial, which the trial court denied, and Dr. Manion's report was read into the record by trial counsel. Wolfe maintains this case turned on the jury's assessment of the experts' credibility and, therefore, the trial court's ruling was in error.

Wolfe argues "Dr. Manion's *live testimony* represented the linchpin of Mr. Wolfe's defense [and w]ithout it, Mr. Wolfe could not receive a fair trial." Wolfe's Brief at 39 (italics in original). Wolfe contends that the reading of Dr. Manion's report into the record did not cure the prejudice, but rather accentuated it because it deprived Wolfe of a full and fair opportunity to present Dr. Manion's findings in a light most favorable to him. Wolfe asserts this case turned upon the jury's assessment of the experts' credibility, which required both parties be afforded the same tools and processes to establish and/or enhance their expert's credibility. Specifically, Wolfe argues the Commonwealth's case hinged on the testimony of one witness, Dr. Esernio-Jenssen, the Commonwealth's expert, who time-dated the victim's injuries. Wolfe claims he retained Dr. Manion whose opinion disputed Dr. Esernio-Jenssen's, but the manner in which the jury received Dr. Manion's findings and conclusions violated his due process rights. Wolfe asserts "due process requires that the defendant be 'afforded an opportunity to present *fully* his version of events which led to his arrest.'" Wolfe's Brief at 43, *citing Commonwealth v. Thompson*, 281 A.2d 856, 858 (Pa. 1971). Wolfe argues his "version of events" required Dr. Manion's in-court testimony. Moreover, he asserts the reading of the report did not allow trial counsel the ability to use demonstrative exhibits nor the ability to question Dr. Manion regarding Dr. Esernio-Jenssen's trial testimony in order to rebut her testimony. As such, Wolfe contends the jury did not have the requisite tools for its assessment of

Dr. Manion, and this unfairly skewed the jury's credibility assessment regarding Dr. Esernio-Jenssen.

The Honorable Kelly L. Banach, in her Pa.R.A.P. 1925(a) opinion, expounded upon the rationale that she placed on the record at the time it denied the motion for mistrial:

> In *Thompson*, defendant appealed his criminal conviction as a violation of fundamental due process because he was foreclosed from presenting evidence. *Com. v. Thompson*, 444 Pa. 312, 316, 281 A.2d 856, 858 (1971). There, defendant was found guilty immediately after testifying and precluded from presenting any further evidence. Our Supreme Court vacated the sentence finding that a defendant should be afforded an opportunity to present fully his version of events including the ability to call witnesses on his behalf or have counsel make arguments to the court. *Id.*
>
> This Court, unlike *Thompson*, did not seek to limit or preclude the Defense from presenting evidence. The Defense was given ample opportunity to present evidence and call witnesses. [Wolfe's] expert was scheduled to testify but failed to appear through no fault of this Court. This Court made significant efforts to accommodate the Defense. When it was discovered that Dr. Manion was missing, this Court excused members of the jury for a break.[43] The Defense could not reach their witness. This Court then excused the jury for an early lunch.[44] It soon became clear the witness was not coming. This Court then adjourned early hoping to provide [Wolfe] additional time to locate his missing witness and present evidence on his behalf.[45] The delay of trial did not provide relief as [Wolfe's] expert failed to appear again on Wednesday, January 25, 2017. Unfortunately, this Court has no power over an out-of-state witness who was not subpoenaed. Therefore, [Wolfe's] assertion that this Court foreclosed evidence, after having provided ample opportunity to bring in the witness, and with no explanation for the witness's failure to appear, is without merit.

_____

[43] The recess occurred at 10:38 a.m.

[44] This Court hoped to divert the jury's attention as attempting to secure witnesses for the afternoon rather than reveal the defense expert witness was missing.

[45] Court was adjourned at 3:41 p.m.

_____

****

… Here, although this Court provided sufficient time for the defense to locate their expert, defense counsel had no legitimate explanation for his failure to appear. A remedy was available and utilized. The Commonwealth agreed to have Dr. Manion's report read into the record in its entirety. This evidence was presented without any opportunity for cross-examination. This Court accommodated the defense by permitting this type of evidence, suggesting to the jury that Dr. Manion had an unavoidable personal emergency that prevented him from appearing in court, and subsequently providing a favorable cautionary instruction. These accommodations were sufficient given the circumstances.

The Court further disagrees with [Wolfe's] description of Dr. Manion's failure to appear as completely unforeseen. Defense counsel attached his correspondence with Dr. Manion in support of his motion for a new trial. In March of 2016, Defense counsel reached out to Dr. Manion. The defense did not hear back from Dr. Manion in April, May, or June despite being paid. On June 20, 2016, Dr. Manion's lack of communication was alarming enough that the defense considered hiring another expert. Sometime in July of 2016, when Dr. Manion was informed he would be replaced he finally made contact. Defense counsel's difficulty with Dr. Manion is apparent throughout the year. Defense counsel had to continually follow-up with Dr. Manion to respond to his communications and repeatedly had to request his written opinion. Dr. Manion subsequently missed the Court's November 1, 2016 deadline for a written report. According to defense counsel, Dr. Manion habitually ignored emails, did not return phone calls, and did not keep scheduled telephone conferences. After reviewing the exhibits, it seems clear that Dr. Manion's failure to appear at trial can hardly be described as unforeseeable.

Finally, the Court expressed concern about the precedent that would be established in granting a mistrial based on a witness

failing to appear for court. In such cases, should either side feel that things were not "going their way," the sudden disappearance of a witness would open the door to potential manipulation.[51]

---

[51] The defense or prosecution could utilize a mistrial to extend the time to prepare a new trial approach or simply get a new jury.

---

Therefore, [Wolfe's] contention that this Court erred by failing to grant a mistrial because his expert continuously failed to appear is without merit and he is entitled to no relief.

Trial Court Opinion, 12/22/2017, at 15–18 (some footnotes omitted).

The trial court's analysis is well reasoned and we find no basis upon which to grant Wolfe relief. Here, it is significant that Dr. Manion's CV and report were presented to the jury by reading them into the record and numerous accommodations were made by the trial court.

Prior to the reading to the jury of Dr. Manion's CV and report by trial counsel, the trial court instructed the jury: "Dr. Manion has experienced an unforeseen personal emergency that kept him from appearing yesterday. He is unable and hasn't appeared today. And we don't believe that he will appear within the next couple of days, such that he is not available to us. It's something, again, that was unforeseen." N.T., 1/25/2017, at 34–35. The trial court proceeded to present the parties' stipulation that, "If called to testify, Dr. Manion would testify consistently with his report that will shortly

be read into the record.[4]  It is further stipulated between all the parties that if Dr. Manion were called to testify, he would be qualified as an expert in the area of forensic pathology and he would be permitted to testify in the area of forensic pathology as an expert." *Id.* at 36.  Dr. Manion's CV and his report were then read into the record by trial counsel, and thereafter the trial court reiterated to the jury:  "You should not make any negative conclusions based on the fact that Dr. Manion was not available to be here today to testify and to support his report.  Again, what we became aware of is an unforeseen emergency that kept him from being here both yesterday and today.  And it's something that was beyond the control of both parties." *Id.* at 60.

While Wolfe argues the reading of Dr. Manion's report limited the jury's assessment of Dr. Manion's credibility, it is important to point out, as did the trial court, that Dr. Manion's report was presented without the opportunity for cross examination.  Furthermore, the trial court gave multiple instructions to the jury concerning Dr. Manion that the jury is presumed to have followed. *See Commonwealth v. Chamberlain*, 30 A.3d 381, 422 (Pa. 2011). Importantly, in this case, the defense's expert evidence was presented to the jury and, under the circumstances of this case, we find Wolfe has failed to demonstrate he was deprived of a fair and impartial trial.  Accordingly, we

---

4 The record reflects that, notwithstanding the stipulation, Wolfe preserved his mistrial issue.  *See* N.T., 1/25/2017, at 25-26.

discern no abuse of discretion on the part of the trial court in denying Wolfe's motion for the extreme remedy of a mistrial.

The remaining issues likewise warrant no relief. Issues Two, Three, and Four are fully addressed and properly rejected by the trial court and we decline to address them further. **See** Trial Court Opinion, 12/22/2017, at 18–25 (finding: (Issue 2) There was a substantial lack of evidence to support a charge of involuntary manslaughter — although Wolfe attempts to support the claim based upon Dr. Esernio-Jenssen's testimony as to whether the shaking of a child is an intentional act, there was no evidence suggesting the infant's injuries were caused by reckless or grossly negligent conduct in that the evidence revealed the child was not only shaken but subjected to an impact capable of causing a skull fracture; (Issue 3) The potential testimony of Dr. Holly Warholic as to the nature and severity of Cristen Sanchez's postpartum depression was prohibited as cumulative and collateral, and the court was mindful of the confidentiality of the witness's medical records; and (Issue 4) The limitation on the cross-examination of Dr. Esernio-Jenssen, regarding prior cases where the court ruled in favor of the opposing party and allegedly rejected Dr. Esernio-Jenssen's opinion was proper since rejection of Dr. Esernio-Jenssen's opinion in favor of a different opinion hardly classifies as a "misdiagnosis" or establishes bias, and Wolfe had established that in Dr. Esernio-Jenssen's prior court testimony her opinion had not always been

accepted, and that she appears a majority of time on behalf of the Commonwealth).

With regard to Issue Five, we find that because this claim was not raised in Wolfe's Pa.R.A.P. 1925(b) statement, it is waived, **see** Pa.R.A.P. 1925(b)(4)(vii), and we further conclude Wolfe's ineffectiveness claim in this regard must be deferred to collateral review. **See Commonwealth v. Grant**, 813 A.2d 726, 738 (Pa. 2002) ("[A]s a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review."). **See also Commonwealth v. Holmes**, 79 A.3d 562, 563-564 (Pa. 2013) (discussing the limited circumstances in which ineffectiveness of counsel claims may be addressed on direct appeal). Hence, we decline to review Wolfe's ineffectiveness claim, and dismiss that claim without prejudice to Wolfe's ability to seek relief pursuant to the Post Conviction Relief Act.

Finally, Issue Six is a claim of cumulative error. However,

> [w]e have repeatedly held that:
>
> an appellant cannot bootstrap a series of meritless claims into a cumulative claim of error. **See Commonwealth v. Rolan**, 2008 PA Super 291, 964 A.2d 398, 411 (Pa.Super. 2008) ("No **number** of **failed** claims may **collectively** attain merit if they could not do so **individually**.") (quoting **Commonwealth v. Williams**, 532 Pa. 265, 615 A.2d 716, 722 (Pa. 1992)) (emphasis in original).

**Commonwealth v. Patterson**, 180 A.3d 1217, 1233 (Pa. Super. 2018), quoting **Commonwealth v. Kearney**, 92 A.3d 51, 62 (Pa. Super. 2014), appeal denied, 101 A.3d 102 (Pa. 2014). Therefore, we reject Wolfe's final claim.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/31/19